BELLSOUTH TELECOMMUNICATIONS, INC., Plaintiff-Counter-Defendant-Appellee-Cross-Appellant,

v.

TOWN OF PALM BEACH, a Florida municipal corporation, Defendant-Counter-Claimant-Appellant-Cross-Appellee.

Bellsouth Telecommunications, Inc., Plaintiff-Counter-Defendant-Appellee-Cross-Appellant,

v.

Coral Springs, City Of, Defendant-Counter-Claimant-Appellant-Cross-Appellee.

Nos. 99-14272, 99-14292.

United States Court of Appeals,

Eleventh Circuit.

May 25, 2001.

Appeals from the United States District Court for the Southern District of Florida. (No. 97-07010-CV-WPD), William P. Dimitrouleas, Judge.

Before BIRCH and BLACK, Circuit Judges, and NESBITT*, District Judge.**

BIRCH, Circuit Judge:

This appeal requires us, as a matter of first impression in this circuit, to answer two questions pertaining to § 253 of the Telecommunications Act of 1996:(1) what is the preemptive scope of § 253; and (2) who may seek enforcement of the provisions of § 253? Because we disagree with the district court's interpretation and application of § 253, and also, in part, because amendments were made to relevant state laws after the district court rendered judgment, we AFFIRM the district court's judgment in part, REVERSE in part, and REMAND to the district court for further proceedings.

## I. BACKGROUND

In the preamble to the Telecommunications Act of 1996[1] ("the Act"), Congress announced that it was passing "[a]n Act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new

---

*Honorable Lenore C. Nesbitt, U.S. Senior District Judge for the Southern District of Florida, sitting by designation.

**Judge Nesbitt did not participate in this decision. This decision is rendered by a quorum. 28 U.S.C. § 46(d).

[1]Pub.L. No. 104-104, 110 Stat. 56 (codified in scattered sections of 47 U.S.C.).

telecommunications technologies." 110 Stat. at 56. The provisions of the Act were intended to supplement and amend the statutory framework established in the Communications Act of 1934, 47 U.S.C. § 151, et seq., and the end result has been described as a "fundamental[ ] restructur[ing of the] local telephone markets." *AT&T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999). The City of Coral Springs and the Town of Palm Beach (collectively, "the Cities") perceived that the Act mandated changes in the way they regulated telecommunications services providers; in response, Coral Springs passed ordinance 97-114 and Palm Beach passed ordinance 16-97, both of which purported to restructure the Cities' franchising and licensing of telecommunications service providers' use of the public rights-of-way in accordance with the new federal law. The Cities' ordinances were similar in many respects, but they adopted different approaches to several significant issues.

BellSouth was the incumbent local telephone service provider in both of the Cities at the time the Act, and subsequently when the ordinances, were passed. BellSouth first brought suit in federal district court against Coral Springs, seeking a declaratory judgment that ordinance 97-114 was preempted both by Florida state law and by § 253 of the Act. Coral Springs filed a counterclaim for breach of contract in which it sought to enforce an ordinance passed in 1965 that gave it the option to purchase BellSouth's facilities. BellSouth moved for summary judgment on its preemption claims and on Coral Springs's counterclaim, and Coral Springs moved for summary judgment on BellSouth's preemption claim. The district court upheld some sections of the ordinance, but found that others were preempted by state or federal law, or both. The district court also granted BellSouth summary judgment on Coral Springs's counterclaim.

After filing suit against Coral Springs, but before that case was resolved, BellSouth filed a similar suit against Palm Beach, seeking a declaratory judgment that its ordinance 16-97 was preempted. Palm Beach filed a counterclaim seeking compensation under the terms of the ordinance. Both parties moved for summary judgment, and the district court, employing the same analysis it had utilized in its summary-judgment order in the Coral Springs case, upheld parts of the ordinance while striking down others on a mixture of federal and state preemption grounds. In its motion for summary judgment in this case, BellSouth had argued that if a substantial portion of the ordinance were preempted, the entire ordinance should fall. The district court, however, found that the preempted sections were severable, and allowed the non-preempted sections of the ordinance to stand. Because one of the sections of the ordinance that the district court struck down was that governing compensation for use of the rights-of-way, the district court *sua*

*sponte* granted BellSouth summary judgment on Palm Beach's counterclaim.

The Cities appealed, challenging the district court's findings of preemption and dismissal of their counterclaims. BellSouth cross-appealed, claiming that the district court erred in upholding sections of the ordinances, or, in the alternative, that the preempted sections were not severable, and, therefore, the ordinances should have been struck down in their entirety.

## II. DISCUSSION

"We apply the same legal standards in our preemption analysis that the district court was required to apply in its order granting summary judgment; therefore, we review the district court's decision *de novo.*" *Lewis v. Brunswick Corp.,* 107 F.3d 1494, 1498 (11th Cir.1997). Because federal preemption of a state or local law is premised on the Supremacy Clause of the United States Constitution, *see Bosarge v. United States Dep't of Educ.,* 5 F.3d 1414, 1419 (11th Cir.1993), and because of the longstanding principle that federal courts should avoid reaching constitutional questions if there are other grounds upon which a case can be decided, *Santamorena v. Ga. Military Coll.,* 147 F.3d 1337, 1343 (11th Cir.1998), we first decide whether the ordinances are preempted by Florida state law before considering whether they are federally preempted by the Act. Further, because each City has included a severability clause in its ordinance stating it is the City's intention that the remainder of the ordinance remain in effect if part of the ordinance is invalidated, we must address each relevant section of each ordinance in turn, reserving judgment on the preemption of the ordinances as a whole until both state and federal preemption analyses have been completed.

A.      *Preemption by Florida State Law*

Under Florida Statutes § 364.01(2), the Florida Public Service Commission ("FPSC") has jurisdiction over the regulation of telecommunications companies within the state. Local governments are preempted from regulating telecommunications companies except to the extent provided in § 337.401, which is the provision of state law that historically has governed municipalities' power to regulate and tax telecommunications companies' use of the public rights-of-way. Our analysis of § 337.401 in this case is complicated somewhat by the fact that the statute has been amended twice since these lawsuits were filed, and future amendments are scheduled. When these lawsuits were initiated in August 1997 and April 1998, the text of § 337.401 had stood unaltered since 1994. In May 1998, however, § 337.401 was substantially amended. *See* 1998 Fla. Laws ch. 98-147. The district court duly took the 1998 amendments to § 337.401 into account when deciding the state-law preemption question in its summary-judgment orders, which issued

in January and September of 1999. After the district court had entered its final judgment in both cases, the Florida legislature amended § 337.401 again with the passage of the Communications Services Tax Simplification Law ("Simplification Law"), 2000 Fla. Laws ch. 00-260. In order to understand the changes envisioned in the Simplification Law, we must begin with an assessment of the law that predated it.

Under the version of § 337.401 as amended in 1998, it was clear that municipalities were prohibited from exercising their authority to manage the public rights-of-way in such a way as to exert regulatory control over matters that fell under the exclusive jurisdiction of the FPSC or the Federal Communications Commission ("FCC"). Fla. Stat. § 337.401(6) (Supp.1998). Municipalities could, however, require telecommunications companies to pay fees of up to "one percent of the gross receipts on recurring local service revenues for services provided within the corporate limits of the municipality" as consideration for the right to occupy the public rights-of-way. *Id.* at § 337.401(3). Municipalities also had the power to enter into agreements with telecommunications companies requiring them to pay fees based on the number of miles of cable laid in the public rights-of-way, as well as certain other fees as compensation for the direct, physical use of the rights-of-way and the administrative costs of regulating the rights-of-way. *Id.* at § 337.401(4).

The impetus for the Simplification Law appears to have been, in large part, the need to bring Florida law into compliance with the Telecommunications Act of 1996. To this end, the Simplification Law mapped out a complicated schedule of amendments to the Florida Statutes, including "transitional" amendments to § 337.401, which took effect on 1 January 2001. 2000 Fla. Laws ch. 00-260, § 50; Fla. Stat. § 337.401 (Supp.2001). The transitional version of § 337.401 severely curtails municipal authority over telecommunications companies by prohibiting municipalities from requiring telecommunications companies to enter into a "license, franchise, or other agreement" as a condition of using the public rights-of-way, *id.* at § 337.401(3)(a), and by requiring that any municipal regulations pertaining to telecommunications companies' use of the public rights-of-way "must be related to the placement or maintenance of facilities in such roads or rights-of-way, must be reasonable and nondiscriminatory, and may include only those matters necessary to manage the roads or rights-of-way," *id.* at § 337.401(3)(b).

The other significant feature of the transitional version of § 337.401, and the feature that indicates why a transitional provision is necessary, is the requirement that each municipality make an election that will affect the rate it will be able to charge if the local communications services tax ("LCST"), authorized under § 11 of the Simplification Law, takes effect on 1 October 2001. Section 337.401(3)(c)(1) requires

municipalities to choose whether they will collect certain limited permit fees from communications providers for use of the public rights-of-way; if a municipality chooses to charge permit fees, it must reduce the rate of its LCST by 0.12%, but if it chooses not to charge such fees, it may increase the rate by 0.12%. Because the LCST does not take effect until 1 October 2001, if it takes effect at all, the transitional § 337.401 carries over, in subsections (3)(e) and (3)(f), the language of the 1998 version's subsections (3) and (4) pertaining to taxes and fees that may be levied on telecommunications companies in the meantime. Section 337.401 is scheduled to be amended again on 1 October 2001, removing the language in subsections (3)(e) and (3)(f) entirely to reflect the implementation of the new LCST scheme. *See* 2000 Fla. Laws ch. 00-260, § 51.

The LCST is intended to replace the patchwork system by which each municipality had set its own formula (within the bounds of prior versions of § 337.401) for how it would tax telecommunications companies' use of the public rights-of-way. In § 12 of the Simplification Law, codified at Fla. Stat. § 202.20 (Supp.2001), the Florida legislature delegated to the Revenue Estimating Conference ("REC") the responsibility of determining, based on the factors prescribed in that section, what the local communications tax rate should be for each municipality and county in the state. Recognizing the difficulties inherent in this task, the Florida legislature structured the Simplification Law to prepare for the contingency that the REC would not be able to establish acceptable rates for the LCSTs: unless the Florida legislature acts before 30 June 2001, on that date section 58 of the Simplification Law will repeal the transitional amendments to § 337.401, as well as the 1 October 2001 amendments to § 337.401 and the other sections implementing the LCST, and § 59 will reinstate the 1998 version of § 337.401 (with only minor changes) on the same day. Presumably, if the REC is successful in setting the rates for the LCSTs, the Florida Legislature will repeal §§ 58 and 59 before 30 June 2001 so that the October amendments, which comprise the essence of the Simplification Law, will go into effect as scheduled.[2]

That is the overall plan under the Simplification Law; however, "[w]here a statute is amended after the entry of judgment in the trial court, but before the decision of the appellate court, the appellate court must 'review the judgment of the district court in light of [the] law as it now stands, not as it stood when the judgment below was entered'." *Naturist Soc'y, Inc. v. Fillyaw,* 958 F.2d 1515, 1519-20 (11th Cir.1992)

---

[2]On 2 May 2001, the Florida Legislature passed S.B. 1878, which provides that the LCST and the other October amendments envisioned in the Simplification Act will take effect on 1 October 2001, with certain changes and clarifications. As of the date of this opinion's issuance, this bill has not yet been signed into law by the Governor of Florida.

(quoting *Diffenderfer v. Cent. Baptist Church,* 404 U.S. 412, 414, 92 S.Ct. 574, 575, 30 L.Ed.2d 567 (1972)). Accordingly, we can only conduct our state-law preemption analysis under the version of the statute that is currently in effect-the transitional version of § 337.401.[3]

1.       Preemption of Specific Sections of Coral Springs Ordinance 97-114 by the Transitional Version of § 337.401

As a preliminary matter, it is necessary to define some of the key terms as they are used in the state law and in the ordinance. Section 337.401 addresses municipal regulation of "telecommunications companies," which are defined in § 364.02(12) as "every corporation, partnership, and person ... offering two-way telecommunications service to the public for hire," but explicitly not including "[a]n entity which provides a telecommunications facility exclusively to a certificated telecommunications company" or "[a] private computer data network company not offering service to the public for hire." Ordinance 97-114, however, refers to "telecommunications facilities," which it defines in section 20-1(20) as "facilit[ies] that [are] used to provide one or more telecommunications services, any portion of which occupies public rights of way." "Telecommunications services" are defined in section 20-1(21) as "the transmission for hire, of information in electronic or optical form, including, but not limited to, voice, video, or data ... but does not include over-the-air broadcasts to the public-at-large from facilities licensed by the Federal Communications Commission or any successor thereto, cable service or open video service." Telecommunications facilities are distinguished from "private communications systems," which are defined in section 20-1(15) as "facilit[ies] placed in whole or in part in the public right of way for the provision of communications in connection with a person's business, but not encompassing in any respect the provision of telecommunications services." The ordinance uses the term "communications facility," defined in section 20-1(5), to refer to both telecommunications facilities and private communications systems.

It is clear from these definitions that provisions of ordinance 97-114 governing "telecommunications facilities" are subject to preemption by § 337.401's limitations on municipal power to regulate "telecommunications companies." Provisions of the ordinance regulating "private communications systems," however, do not fall within the penumbra of § 337.401. Because no section of the ordinance is preempted by state law as it pertains to private communications systems, our preemption analysis is conducted exclusively

---

[3]While it is possible for the post-judgment amendment of a challenged statute to render the appeal of that judgment moot, *see Fillyaw,* 958 F.2d at 1519-20, in this case, a live controversy remains as to whether the Cities' ordinances are preempted under the Simplification Law's transitional amendments to § 337.401.

in terms of its effect on telecommunications facilities, as that term is defined in the ordinance.

We address each relevant section of the ordinance in turn.

*Section 20-2. Franchise Required:* This section requires the operators of telecommunications facilities to obtain franchises prior to providing telecommunications services within Coral Springs. The franchise requirements in subsections (1) and (2) and the license requirements for telecommunications facilities in subsection (3) are flatly preempted by § 337.401(3)(a), which prohibits municipalities from requiring telecommunications companies to enter licenses, franchises, or other agreements as a condition of using the public right-of-way to provide telecommunications services.

*Section 20-3. Compensation Required:* This section requires the operators of telecommunications facilities to pay the greater of an occupancy fee or a franchise fee to Coral Springs as compensation for the use of the public rights-of-way. The franchise fee, which is established in section 20-21(5)(A) as 10% of the gross revenues generated by the operator of the telecommunications facility's use of the public rights-of-way, is obviously preempted by the prohibition of franchises in § 337.401(3)(a). Section 20-3 states that the occupancy fee, however, "is intended to recover ongoing right-of way costs to the City caused by burdens users place upon the right-of-way," and is to be established on a per-linear-foot basis for telecommunications facilities located in the rights-of-way. This type of a fee is specifically authorized by state law, but § 337.401(3)(f) establishes several factors that limit the maximum permissible amount of the fee. Thus, the occupancy fee is not facially void under state law, but there remains a question as to whether Coral Springs has in fact limited the rate of the occupancy tax it exacts to comply with the state-law limits outlined in § 337.401(3)(f). Because neither party has presented evidence of whether the actual amount of the occupancy fee Coral Springs has charged exceeds that permitted in § 337.401(3)(f), neither party is entitled to summary judgment on the issue of whether the occupancy tax, as applied, is preempted by state law.

*Section 20-4. General Conditions Upon Use of Rights-of-Way:* The district court upheld most of this section, finding it to be a "reasonable regulation of what happens on the ground within the rights-of-way," as it consists primarily of straightforward provisions governing the installation, construction, relocation, and maintenance of telecommunications facilities. We find, with the exception of two subsections, that section 20-4 is not preempted by state law because its provisions fall within the ambit of § 337.401(3)(b), which reserves to municipalities the right to adopt rules or regulations governing the roads and rights-of-way, so long as they are "related to the placement or maintenance of facilities in such roads or rights-of-way, [are]

reasonable and nondiscriminatory, and ... include only those matters necessary to manage the roads or rights-of-way."

The first problem is the second sentence in subsection (4) to section 20-4, which reads: "Each operator must respond to requests for information regarding its system and plans for the system as the City may from time to time issue, including requests for information regarding its plans for construction, operation and repair and the purposes for which the plant is being constructed, operated or repaired." As stated previously, under § 364.01(2), local governments are preempted from regulating telecommunications companies except to the extent provided in § 337.401. While Coral Springs's reservation of the power to request information from operators of telecommunications facilities regarding their future plans for use of the rights-of-way constitutes a reasonable regulation of the rights-of-way under § 337.401(3)(b), the second sentence of subsection (4), by its terms, "includes," but is not limited to, requests for information concerning the rights-of-way. Because it is not limited to matters involving the rights-of-way, this provision exceeds the municipality's grant of authority from the state, and is preempted.[4]

The second problem with section 20-4 is found in subsection (7), titled "No discrimination." Under this subsection, Coral Springs requires that telecommunications facility operators not discriminate against "subscribers, programmers, or residents of the City on the basis of race, color, creed, national origin, sex, age, conditions of physical handicap, religion, ethnic background, marital status, or sexual orientation," and that they comply with federal, state, and local equal employment laws. This subsection also prohibits telecommunications facility operators from discriminating or retaliating against individuals or the City for the exercise of any legally protected right. The requirements in subsection (7) clearly exceed the municipality's authority under § 337.401(3)(b) to issue regulations "related to the placement or maintenance of facilities in [its] roads or rights-of-way." This subsection includes a "savings clause," however, which states that these provisions are "[s]ubject to State and Federal law limitations ... on the City's authority." Thus, we need not strike down this subsection on a facial challenge because it is effectively "self-preempting."[5] Essentially, this subsection stands as a reservation-of-rights clause in the event that Coral

---

[4]We decline to apply a limiting construction to save the valid portions of the information request provision, because "as a federal court, we must be particularly reluctant to rewrite the terms of a state statute." *Dimmitt v. City of Clearwater,* 985 F.2d 1565, 1572 (11th Cir.1993) (emphasis omitted).

[5]BellSouth has not claimed that Coral Springs is, in fact, enforcing the terms of this subsection in a manner inconsistent with § 337.401.

Springs is granted the authority to regulate these matters in the future.

*Section 20-5. Protection of the City and Residents:* Under this section, Coral Springs establishes standards for indemnification, insurance, performance bonds, and a security fund that are required of telecommunications companies seeking to use the public rights-of-way. These are reasonable regulations directly related to the management of the rights-of-way, and are therefore authorized under § 337.401(3)(b).

*Section 20-6. Enforcement and Remedies:* Subsections (1) "Administration," (7) "Remedies Cumulative," (13) "Reservation of authority," and (15) "Ordinance not a contract," are "housekeeping" provisions that are necessary to the enforcement of the ordinance but do not actually regulate telecommunications providers; these sections are not preempted by state law.

Subsections (2), (3), (5), (6), (12), and (14) of section 20-6 pertain to licenses and franchises, and are therefore preempted by § 337.401(3)(a), which prohibits these arrangements to the extent they apply to telecommunications companies.

Subsection (4) "Penalties" provides for a fine to be levied against any person who violates the ordinance. While the fine may not be used to enforce any section of the ordinance that has been found to be preempted, the power to fine is a police power, and therefore is reserved to the municipality under § 337.401(3)(b).

Subsection (8) "Access to books and records" grants Coral Springs access to all books and records in a telecommunications company's possession pertaining to "the construction, operation, or repair of the communications facility," and "to the extent that the franchise fees or license fees are based upon gross revenue or gross receipts," Coral Springs claims access to "all books and records related to revenues derived from the operation of the communications facility." Coral Springs's power to access documents pertaining to the construction and repair of communications facilities is necessary to its direct regulation of the rights-of-way, and is therefore authorized under § 337.401(3)(b); however, under state law it does not have a right to access books and records relating to "operations," as that term extends far beyond those matters directly related to the rights-of-way. Further, because the franchise and license fee as applied to telecommunications companies is preempted under § 337.401(3)(a), Coral Springs's ability to request financial information for the purpose of determining compliance with such a fee is also preempted.

Subsection (9) "Retention of Records," and subsection (10) "Reports," require the operators of telecommunications facilities to retain records and prepare reports as requested to aid Coral Springs in

determining if the facilities are in compliance with the ordinance. These requirements are valid under § 337.401(3)(b) as they are necessary to Coral Springs's regulation of the rights-of-way.

Subsection (11) "Maps" requires operators of telecommunications facilities to "maintain accurate maps and improvement plans which show the location, size, and a general description of all facilities installed in the rights-of-way." This requirement is valid under § 337.401(3)(b) as a reasonable means by which the City can ensure that future construction in the rights-of-way does not interfere with or damage existing communications lines and facilities.

*Section 20-7. Transitional Provisions:* Subsection (1) addresses the process by which persons operating telecommunications facilities without a franchise or license at the time of the ordinance's enactment should file for a franchise or license, and subsection (2) states that persons holding franchises or licenses at the time of the ordinance's enactment may continue to operate under the terms of the franchise or license until its expiration. These subsections are preempted by § 337.401(3)(a), which prohibits municipalities from requiring telecommunications companies to enter franchises or licenses. Subsection (3), which states that the passage of the ordinance does not affect persons with existing leases of property in the rights-of-way, is not preempted.

*Section 20-21. Application for a Franchise:* This section sets out the process an applicant must undergo and the criteria an applicant must meet in order to obtain a franchise to operate a telecommunications facility in the rights-of-way in Coral Springs, and also sets out the formula for the calculation of the franchise fee. While Coral Springs does have the right under § 337.401(3)(a) to request some of the information and credentials from a telecommunications company that it requests under section 20-21, it clearly may not do so in the context of a franchise application, and it may not charge a franchise fee. This section is preempted in its entirety.

2.  Preemption of Specific Sections of Palm Beach Ordinance 16-97 by the Transitional Version of § 337.401

The scope of ordinance 16-97 is significantly broader than that of ordinance 97-114, as it regulates telecommunications facilities and services, private communications systems, cable systems, and open video systems. The only provisions of the ordinance subject to preemption by § 337.401, however, are those pertaining to the regulation of telecommunications facilities and services, as those terms are defined in the

ordinance,[6] and so our analysis of the ordinance is limited to its effects on those areas.

*Title I, Section 2. Franchise Required:* This section requires the operators of telecommunications facilities to obtain franchises prior to providing telecommunications services within Palm Beach. It is preempted by § 337.401(3)(a), which explicitly prohibits municipalities from requiring telecommunications companies to enter licenses, franchises, or other agreements as a condition of using the public right-of-way to provide telecommunications services.

*Title I, Section 3. Compensation Required:* This section requires the operators of telecommunications facilities to pay the following fees: (i) a fee for applying for a franchise; (ii) additional compensation should Palm Beach's expenses in evaluating the franchise application exceed the initial application fee; (iii) the costs of any experts or consultants used in evaluating the application; (iv) an annual occupancy fee; and (v) a franchise fee, established in title II of the ordinance.

All of the fees associated with a franchise would be preempted by § 337.401(3)(a), which prohibits municipalities from imposing franchise agreements on telecommunications companies. Subsection 3.4, however, includes a savings clause, stating that the franchise fees need not be paid if "State law ... requires otherwise." Thus, while Palm Beach cannot currently charge any of the fees associated with the franchise provisions of the ordinance, we need not strike down this section on a facial challenge because it is "self-preempting." This subsection stands as a reservation-of-rights clause in the event that Palm Beach is granted the authority to require franchises of telecommunications companies in the future.[7]

The ordinance does not elaborate on the terms of the annual occupancy fee, other than to state in subsection 3.3 that it "may be charged on a gross revenue or per-linear-foot basis." Subject to limitations, an occupancy fee based on gross revenues is permitted under state law in § 337.401(3)(e), and a fee based on distance of cable laid is permitted in § 337.401(3)(f). The occupancy fee, therefore, is not facially preempted, but may be preempted if the actual fees charged by Palm Beach exceed the limitations in § 337.401. Because neither party has presented evidence of the actual amount of the occupancy fee Palm Beach

---

[6]Title I, section 1.23 defines "telecommunications facility" as "a facility that is used to provide one or more telecommunications services, any portion of which occupies the public rights of way." Section 1.24 defines "telecommunications services" as "the transmission for hire, of information in electronic or optical form, including, but not limited to, voice, video, or data," and includes "telephone service but does not include over-the-air broadcasts to the public-at-large from facilities licensed by the Federal Communications Commission."

[7]BellSouth has not claimed that Palm Beach is, in fact, currently charging it the franchise fee and associated costs.

has charged, neither party is entitled to summary judgment on the issue of whether the occupancy tax, as applied, is preempted by state law.

*Title I, Section 4. General Conditions Upon Use of Rights-of-Way:* This section consists primarily of straightforward provisions governing the installation, construction, relocation, and maintenance of telecommunications facilities. With three exceptions, section 4 is not preempted by state law because its provisions are reasonable rules or regulations "related to the placement or maintenance of facilities in such roads or rights-of-way" permitted under § 337.401(3)(b).

The first preempted provision is subsection 4.2.6, which reads:

> Every operator of a communications facility shall make available to other franchisees or licensees any of its conduits that is excess, so long as it is excess, at a reasonable, non-discriminatory rental fee.... The Town may require as a condition of issuing any right-of-way permit for underground conduit the installation of which requires excavation ... that the franchisee, licensee, or holder of the right-of-way permit emplace conduit in excess of its present and reasonably foreseeable requirements for the purpose of accommodating other franchisees and licensees for a reasonable charge.

This requirement places a potentially substantial burden on telecommunications companies that, while perhaps furthering Palm Beach's policies for the development of its technological infrastructure, goes far beyond the authority allotted it in § 337.401(3)(b) to regulate "only those matters necessary to manage the roads or rights-of-way."

The second preempted subsection, 4.4, states:

> Every communications facility shall be subject to the right of periodic inspection and testing by the Town to determine compliance with the provisions of this Ordinance, a franchise or license agreement, or other applicable law. The Town shall have the right, upon request, to be notified and present when the communications facility is tested by the operator. Each operator must respond to requests for information regarding its system and plans for the system as the Town may from time to time issue, including requests for information regarding its plans for construction, operation and repair and the purposes for which the plant is being constructed, operated or repaired.

While Palm Beach does have certain rights to inspect the telecommunications facilities and request information relating to them, under § 337.401(3)(b) it may only do so with respect to matters concerning the physical use and management of the rights-of-way. Because this subsection is not so limited, it is preempted.

The third preempted subsection is 4.7, titled "No discrimination." Under this subsection, Palm Beach requires that telecommunications facility operators not discriminate "on the basis of race, color, creed, national origin, sex, age, conditions of physical handicap, religion, ethnic background, marital status, or sexual orientation," in both its provision of service and its employment practices. This subsection also prohibits telecommunications facility operators from discriminating or retaliating against individuals or the City for the exercise of any legally protected right. Finally, the subsection requires that telecommunications

facilities operators not deny access or levy different rates on customers based on income. The requirements in subsection 4.7 go far beyond matters necessary to regulate the physical rights-of-way, and therefore exceed the municipality's authority under § 337.401(3)(b).

*Title I, Section 5. Protection of the Town and Residents:* Under this section, Palm Beach establishes standards for indemnification, insurance, performance bonds, and a security fund that are required of telecommunications companies seeking to use the public rights-of-way. These are reasonable regulations directly related to the management of the rights-of-way, and are therefore authorized under § 337.401(3)(b).

*Title I, Section 6. Enforcement and Remedies:* Subsections 6.1 "Town Manager responsible for administration," 6.7 "Remedies Cumulative," 6.13 "Reservation of Authority," 6.14 "No waiver," and 6.15 "Ordinance not a contract," are "housekeeping" provisions that are necessary to the enforcement of the ordinance but do not actually regulate telecommunications providers; these sections are not preempted by state law.

Subsections 6.2, 6.3, 6.5, 6.6, and 6.12 pertain to licenses and franchises, and are therefore preempted by § 337.401(3)(a), which prohibits these arrangements to the extent they apply to telecommunications companies.

Subsection 6.4 "Penalties" provides for a fine to be levied against any person who violates the ordinance. While the fine may not be used to enforce any section of the ordinance that has been found to be preempted, the power to fine is a police power, and therefore is reserved to the municipality under § 337.401(3)(b).

Subsection 6.8 "Access to books and records" grants Palm Beach access to all books and records in a telecommunications company's possession "related to the construction, operation, or repair of the communications facility," as well as all books and records "related to revenues derived from the operation of the communications facility." Palm Beach's power to access documents pertaining to the construction and repair of communications facilities is necessary to its direct regulation of the rights-of-way, and is therefore authorized under § 337.401(3)(b); however, under state law it does not have a right to access books and records relating to operations or revenues, as those matters are not directly related to the rights-of-way.

Subsection 6.9 "Retention of Records," and subsection 6.10 "Reports," require the operators of telecommunications facilities to retain records and prepare reports as requested to aid Palm Beach in determining if the facilities are in compliance with the ordinance. These requirements are valid under §

337.401(3)(b) as they are necessary to Palm Beach's regulation of the rights-of-way.

Subsection 6.11 "Maps" requires operators of telecommunications facilities to "maintain accurate maps and improvement plans which show the location, size, and a general description of all facilities installed in the public rights-of-way." This requirement is valid under § 337.401(3)(b) as a reasonable means by which the City can ensure that future construction in the rights-of-way does not interfere with or damage existing communications lines and facilities.

*Title I, Section 7. Transitional Provisions:* Subsection 7.1 addresses the process by which persons operating telecommunications facilities without a franchise or license at the time of the ordinance's enactment should file for a franchise or license, and subsection 7.2 states that persons holding franchises or licenses at the time of the ordinance's enactment may continue to operate under the terms of the franchise or license until its expiration. These subsections are preempted by § 337.401(3)(a), which prohibits municipalities from requiring telecommunications companies to enter franchises or licenses. Subsection 7.3, which states that the passage of the ordinance does not affect persons with existing leases of property in the rights-of-way, is not preempted.

*Title II, Section 1. Application for a Franchise:* This section sets out the process an applicant must undergo and the criteria an applicant must meet in order to obtain a franchise to operate a telecommunications facility in the rights-of-way in Palm Beach, and also sets out the formula for the calculation of the franchise fee. While Palm Beach does have the right under § 337.401(3)(a) to request some of the information and credentials from a communications company that it requests under this section, it clearly may not do so in the context of a franchise application, and it may not charge a franchise fee. This section is preempted in its entirety.

B.      *Preemption by § 253 of the Telecommunications Act of 1996*

Because sections of both ordinances remain that were not preempted by state law, it is necessary for us to consider BellSouth's claim that the ordinances are preempted by § 253 of the Act, titled "Removal of Barriers to Entry."[8] Section 253 reads, in relevant part:

(a) In general

> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

---

[8]*Codified at* 47 U.S.C. § 253.

(b) State regulatory authority

> Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) Preemption

> If, after notice and an opportunity for public comment, the [Federal Communications] Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

As has been observed by other federal courts, the language and structure of § 253 raise two difficult questions of statutory interpretation:  (1) what is the preemptive scope of § 253;  and (2) who may seek enforcement of the provisions of § 253?  *See TCG Detroit v. City of Dearborn,* 206 F.3d 618, 623 (6th Cir.2000);  *Cablevision of Boston, Inc. v. Public Improvement Comm'n,* 184 F.3d 88, 98-99 (1st Cir.1999). We must answer these issues of first impression before we can consider whether the remaining sections of the ordinances are preempted by federal law.[9]

1.      Substantive Limits on State and Local Authority in § 253

The heart of § 253 is subsection (a), which prohibits state and local governments from passing laws or other regulations that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a).  It is beyond dispute that subsection (a) imposes a substantive limitation on the authority of state and local governments to regulate telecommunications.

---

[9]The Sixth Circuit has held that the question of whether § 253 creates a private cause of action is a question affecting our subject-matter jurisdiction. *TCG Detroit,* 206 F.3d at 622.  If it were a jurisdictional matter, we would be required to address it first, before proceeding to the issue of § 253's preemptive scope. *See Garcia-Mir v. Smith,* 766 F.2d 1478, 1486 (11th Cir.1985) (per curiam).  The Supreme Court, however, has flatly stated that "[t]he question whether a federal statute creates a claim for relief is not jurisdictional." *Northwest Airlines, Inc. v. County of Kent, Mich.,* 510 U.S. 355, 365, 114 S.Ct. 855, 862, 127 L.Ed.2d 183 (1994).  Therefore, not being compelled to address the question of whether § 253 creates a private cause of action first, we address these closely entwined issues in the most analytically manageable order.

The difficult question here pertains to the function of subsections (b) and (c). Several federal district courts, including the district court in these cases, have interpreted subsections (b) and (c) as imposing substantive limitations on state and local authority in the telecommunications field. Primarily in the context of interpreting subsection (c), these courts have held that the *only* regulatory authority retained by the state and local governments is the authority to perform the functions specifically reserved in those subsections. *See Bell Atlantic-Md., Inc. v. Prince George's County, Md.,* 49 F.Supp.2d 805, 814 (D.Md.1999) (*rev'd on other grounds,* 212 F.3d 863 (4th Cir.2000)); *AT&T Communications of the Southwest, Inc. v. City of Dallas,* 8 F.Supp.2d 582, 591 (N.D.Tex.1998); *TCG Detroit v. City of Dearborn,* 977 F.Supp. 836, 841 (E.D.Mich.1997) (*aff'd,* 206 F.3d 618 (6th Cir.2000)). At least one district court, however, has interpreted (b) and (c) not as limiting state and local authority, but as defining the "safe harbors," that is, the exceptions to the general prohibition stated in subsection (a). *See TCG New York, Inc. v. City of White Plains, N.Y.,* 125 F.Supp.2d 81, 87 (S.D.N.Y.2000).

The confusion arises because of perceived inconsistencies within the structure of the statute. Subsection (a) states the general limitations on state and local government regulation of telecommunications. Subsections (b) and (c) are structurally identical to one another: (b) begins with the phrase "Nothing in this section shall affect ...", and (c) begins with the phrase "Nothing in this section affects ..."; thus, (b) and (c) are couched not in terms of limitation, but of exception to the general rule set forth in (a). Subsection (d), however, states that the FCC shall preempt any state or local statute or regulation "that violates subsection (a) or (b) of this section." It would seem that if an entity could "violate" subsection (b), then subsection (b) must impose some sort of substantive limitations, and because they are structured similarly, if (b) imposes separate limitations, so must (c). Therein lies the apparent conflict. Based on four factors, however, we find that subsection (a) contains the only substantive limitations on state and local government regulation of telecommunications, and that subsections (b) and (c) are "safe harbors," functioning as affirmative defenses to preemption of state or local exercises of authority that would otherwise violate (a).

When interpreting a statute, "it is axiomatic that a court must begin with the plain language of the statute." *United States v. Prather,* 205 F.3d 1265, 1269 (11th Cir.2000). The first and most basic reason for interpreting (b) and (c) as safe harbor provisions is that, reading (a), (b), and (c) together, it is the only interpretation supported by the plain language of the statute; unless one omits the opening phrase in subsections (b) and (c) completely or otherwise inflicts some grave injustice on the rules of English grammar,

it is not possible to read these subsections as pronouncing separate limitations that a state or local government could "violate."[10] Because they begin with the phrase "Nothing in this section shall affect ...," it is clear that subsections (b) and (c) are defining exceptions to (a), and that whatever language follows that initial phrase, it derives meaning only through its relationship to (a). Latent in the opinions of the courts that have read subsections (b) and (c) as independent limitations on state and local authority is the maxim that *inclusion unis est exclusion alterius,* that is, that by expressly reserving certain powers to the state and local governments in (b) and (c), Congress must have intended that only those powers be reserved. While this argument may have some appeal at first blush, we note that if we were to read (b) and (c) as delineating the absolute boundaries of state and local regulatory authority in the field of telecommunications, the limitation set forth in subsection (a) would be superfluous. Settled principles of statutory construction counsel against such a reading, *see Mears Transp. Group v. Florida,* 34 F.3d 1013, 1019 (11th Cir.1994), particularly when it would violate the plain meaning of the statute.

Our second reason for viewing subsection (a) as the only limitation on state and local governments in § 253 and interpreting subsections (b) and (c) as exceptions to (a) is that that is how the FCC has interpreted the statute.[11] In 1998, the FCC issued its "Suggested Guidelines for Petitions for Ruling under Section 253 of the Communications Act." *Available at* http://www.fcc.gov/ Bureaus/Common _ Carrier/Public _ Notices/ 1998/fcc98295.txt. In these guidelines, the FCC stated:

> In preparing their submissions, parties should address as appropriate all parts of section 253. In particular, parties should first describe whether the challenged requirement falls within the proscription of section 253(a); if it does, parties should describe whether the requirement nevertheless is permissible under other sections of the statute, specifically sections 253(b) and (c).

*Id.* Thus, it is clear that (b) and (c) are exceptions to (a), rather than separate limitations on state and local authority in addition to those in (a). Consistent with this interpretation, if a party seeking preemption fails

---

[10]Of course, this is not to say that a state statute or regulation may not meet the criteria of subsection (b), and a local ordinance may not meet the criteria of subsection (c). But if the statute or ordinance in question does not meet these criteria, the state or local government has not "violated" the subsections; rather, the particular regulation is not immune from preemption as an exception to the general prohibition in (a).

[11]As the federal agency charged with implementing the Act, the FCC's views on the interpretation of § 253 warrant respect. "We need not inquire whether the degree of deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is in order; it is enough to observe that the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Olmstead v. Zirming,* 527 U.S. 581, 598, 119 S.Ct. 2176, 2186, 144 L.Ed.2d 540 (1999) (internal citations omitted).

to make the threshold showing that a state or local statute or ordinance violates (a) because it "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service," the FCC has found it unnecessary to consider whether the statute or ordinance is "saved" by the exceptions in (b) or (c). *See, e.g., In re Missouri Municipal League,* --- FCC Rec. ---- (2001); *In re Minnesota,* 14 FCC Rec. 21,697, 21,730 (1999); *In re American Communications Servs., Inc.,* 14 FCC Rec. 21,579, 21,587-88 (1999); *In re Cal. Payphone Ass'n,* 12 FCC Rec. 14,191, 14,203 (1997).

The third factor bolstering our conclusion that Congress intended subsections (b) and (c) to be used defensively by state and local governments comes from the legislative history. The remarks of Senator Hollings during the Senate debate explain how (b) and (c) were written into the Act:

> When we provided that [subsection (a) ], the States necessarily came and said, wait a minute, that sounds good, but we have the responsibilities over the public safety and welfare. We have a responsibility along with you with respect to universal service. So what about that? How are we going to do our job with that overencompassing [sic] general section (a) that you have there. So we [added subsection (b) ]. We did not want and had no idea of taking away that basic responsibility for protecting the public safety and welfare and also providing and advancing universal service. So that was written in at the request of the States, and they like it. The mayors came, as you well indicate, and they said we have our rights of way ... and every mayor must control the rights of way. So we wrote [subsection (c) ] in there.... We have had experience here with the mayors coming and asking us. And this is the response. That particular section (c) is in response to the request of the mayors.

141 Cong. Rec. S8174 (daily ed. June 12, 1995). Put in context, it is clear that subsections (b) and (c) were added to the statute to preserve, rather than to limit, state and local government authority.

The final factor supporting our reading of § 253 is the legislative history surrounding subsection (d). This history, for reasons that are fully addressed *infra* in our discussion of whether there is a private cause of action under § 253, makes it clear that subsection (d) was not intended to affect the interrelationship of subsections (a), (b), and (c), but that its apparent inconsistency with the scheme set forth in those subsections was the result of a late amendment that was intended only to designate the forum in which challenges to statutes or ordinances governing particular matters were brought.

2.      Private Cause of Action

Our touchstone in determining whether a federal statute implies a private cause of action remains the four-part test handed down by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[12] Opinions refining the *Cort* analysis have indicated that the focal point of the inquiry is the

---

[12]The *Cort* factors are: (1) whether "the plaintiff one of the class for whose *especial* benefit the statute was enacted;" (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one;" (3) whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff;" and (4) whether the cause of action is "one

second factor, evidence of Congressional intent, and that a court should search for such evidence primarily within the language and structure of the statute, as well as in the legislative history. *See Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988); *Ayres v. Gen. Motors Corp.,* 234 F.3d 514, 522-23 (11th Cir.2000).

In this case, an analysis of the statutory language creates more questions than it answers about what causes of action Congress intended to create and who it intended to enforce them. Subsection (d), titled "Preemption," is the enforcement provision, and it expressly obligates the FCC to preempt statutes that "violate" subsections (a) and (b). If the FCC is to enforce (a) and (b), this suggests that the enforcement of (c) is left to private parties. But, as we have demonstrated, subsections (b) and (c) are safe harbor provisions that cannot be violated, and therefore cannot form the basis of a cause of action against a state or local government. In this case, we must go beyond the plain language of the statute to reconcile the apparent conflicts when subsections (a) through (d) are read literally.

Fortunately, the legislative history pertaining to subsection (d) clearly indicates Congress's intentions when it drafted subsection (d). The Act began as Senate Bill 652 in the 104th Congress. In its initial form, subsection (d) read:

> PREEMPTION.—If, after notice and an opportunity for public comment, the [Federal Communications] Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates or is inconsistent with this section, the Commission shall immediately preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.[13]

Under this version, it was clear that preemption under this section was a purely administrative procedure, with jurisdiction vesting in the FCC.

Senators Feinstein and Kempthorne, the former mayors of San Francisco and Boise, respectively, were troubled by the impact that subsection (d) would have on city governments. Senator Feinstein stated why she and Senator Kempthorne felt FCC jurisdiction over preemption was improper:

> That means that cities will have to send delegations of city attorneys to Washington to go before a panel of telecommunications specialist[s] at the FCC, on what may be [a] very broad question of State or local government rights. In reality, this preemption provision is an unfunded mandate because it will create major new costs for cities and for States.

---

traditionally relegated to state law, in an area basically the concern of the States." *Id.* at 78, 95 S.Ct. at 2088.

[13] At this point in the legislation's development, the provisions that eventually became § 253 were designated as § 254.

141 Cong. Rec. S8170 (daily ed. June 12, 1995). Senators Feinstein and Kempthorne felt that the proper venue for resolving these disputes was the local federal district courts. *See id.* at S8171. Together, they sponsored amendment No. 1270 to the bill, for the purpose of "strik[ing] the authority of the Federal Communications Commission to preempt State or local regulations that establish barriers to entry for interstate or intrastate telecommunications services." 141 Cong. Rec. S8305 (daily ed. June 14, 1995). The Feinstein-Kempthorne amendment was met with opposition from those who felt that the FCC remained the proper body to resolve these issues. *See* 141 Cong. Rec. S8173 (daily ed. June 12, 1995) (remarks of Senator Pressler), S8174 (remarks of Senator Hollings).

In response, Senator Gorton proposed amendment No. 1277, a second-degree amendment to the Feinstein-Kempthorne amendment, which was intended to be a compromise provision. First, Senator Gorton noted that the Feinstein-Kempthorne amendment, and therefore his own second-degree amendment to it, was limited: "It does not impact the substance of the first three subsections at all, but it does shift the forum in which a question about these three subsections is decided." 141 Cong. Rec. S8212 (daily ed. June 13, 1995). Senator Gorton then explained precisely the scope and purpose of his amendment:

> I join with the two sponsors of the Feinstein amendment in agreeing that the rules that a city or a county imposes on how its street rights of way are going to be utilized, whether there are to be above-ground wires or underground wires, what kind of equipment ought to be used in excavations, what hours the excavations should take place, are a matter of primarily local concern and, of course, they are exempted by subsection (c) of this section.

> So my modification of the Feinstein amendment says that in the case of these purely local matters dealing with rights of way, there will not be a jurisdiction on the part of the FCC immediately to enjoin the enforcement of those local ordinances. But if, under section (b), a city or county makes quite different rules relating to universal service or the quality of telecommunications services—the very heart of this bill—then there should be a central agency at Washington, DC, which determines whether or not that inhibits the competition and the very goals of this bill.

> ...

> [The Gorton amendment] retains not only the right of local communities to deal with their rights of way, but their right to meet any challenge on home ground in their local district courts. The Feinstein amendment itself ... would deprive the FCC of any jurisdiction over a State law which deliberately prohibited or frustrated the ability of any telecommunications entity to provide competitive service. It would simply take that right away from the FCC, and each such challenge would have to be decided in each of the various Federal district courts around the country.

> The States retain the right under subsection (d) to pass all kinds of legislation that deals with telecommunications providers, subject to the provision that they cannot impede competition. The determination of whether they have impeded competition, not by the way they manage trees or rights of way, but by the way they deal with substantive law dealing with telecommunications entities. That conflict should be decided in one central place, by the FCC. The appropriate balance is to leave purely local concerns to local entities, but to make decisions on the natural concerns which are at the heart of this bill in one central place so they can be consistent across the country.

141 Cong. Rec. S8306, S8308 (daily ed. June 14, 1995). The Senate voted down the Feinstein-Kempthorne amendment and then adopted the Gorton amendment by a voice vote, *id.* at S8308, and consequently subsection (d) was amended to the form in which it exists today.

With the benefit of Senator Gorton's remarks, it is clear that subsection (d), despite its less-than-clear language, serves a single purpose—it establishes different forums based on the subject matter of the challenged statute or ordinance. Accordingly, we hold that a private cause of action in federal district court exists under § 253 to seek preemption of a state or local statute, ordinance, or other regulation only when that statute, ordinance, or regulation purports to address the management of the public rights-of-way, thereby potentially implicating subsection (c).[14] All other challenges brought under § 253 must be addressed to the FCC.

3.      Application of § 253 to BellSouth's Claims

BellSouth brought these lawsuits against the Cities, alleging that their ordinances violated §§ 253(a) and (c). These ordinances specifically state that their purpose is to set out the rules governing the Cities' management of their rights-of-way, and so the district court is the proper forum for BellSouth's complaints. In both cases, the district court considered whether the individual sections of the ordinances fell within the parameters of (c), but never addressed, in the first instance, whether the ordinances violated subsection (a). Accordingly, we remand these cases to the district court for further proceedings to determine whether the sections of the ordinances that are not preempted by Florida state law violate subsection (a) because they "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." If the district court finds that any of these provisions do violate (a), then the Cities shall have an opportunity to establish that the provisions are nevertheless not preempted because they fall within the safe harbor provided in (c).[15] The district court should reconsider the issue of severability after it has determined the full extent to which the ordinances are preempted by state and federal law.

---

[14]"When an examination of one or more of the *Cort* factors unequivocally reveals congressional intent, there is no need for us to trudge through all four of the factors." *Ayres,* 234 F.3d at 524 (punctuation and citations omitted).

[15]We are not requiring that a district court always make findings under § 253(a) before addressing the § 253(c) question. Judicial economy may best be served by initially conducting the § 253(c) analysis in cases in which the court can easily determine that the ordinance is not preempted because it falls within the § 253(c) safe harbor. However, before declaring an ordinance preempted, a court must conduct both the § 253(a) and the § 253(c) analyses. Here, the district court erred when it declared the ordinances preempted without first determining that BellSouth had established its prima facie case under § 253(a).

C.      *The Cities' Counterclaims*

Both Cities appeal the district court's grants of summary judgment in favor of BellSouth on the issue of the Cities' individual counterclaims. Palm Beach had sought payment of fees under the provisions of its ordinance, and Coral Springs had sought to enforce an ordinance that gave it the option of purchasing the telecommunications facilities that BellSouth had built in its rights-of-way. The district court summarily found these counterclaims to have been preempted by state and federal law. We remand these counterclaims to the district court for reconsideration in light of our clarification of the preemptive scope of the relevant state and federal laws. We, however, express no opinion on the merits of these counterclaims.

## III. CONCLUSION

In this appeal, the Cities challenge the district court's finding that sections of their ordinances were preempted by Florida state law and by § 253 of the Telecommunications Act of 1996. BellSouth cross-appeals the district court's decisions not to find the ordinances preempted in their entirety. We hold that specific subsections of the ordinances are preempted by § 337.401 of the Florida Statutes, but that others are valid exercises of local authority under the Florida scheme. We also hold that § 253 of the Act creates a private right of action only for parties seeking preemption of a state or local statute, ordinance, or other regulation that purports to be a management of the public rights-of-way. We further hold that the district court erred when it failed to consider whether the ordinances violated § 253(a). For these reasons, we AFFIRM the district court's judgments in part, REVERSE in part, and REMAND to the district court for further proceedings.[16]

---

[16]Should the relevant Florida law change between the date of this opinion's issuance and the date on which the district court issues its order, the district court is instructed to reevaluate the state-law preemption question in light of the new law, guided by the approach we have taken here.