**QWEST COMMUNICATIONS Corp., Plaintiff,**

v.

**The CITY OF BERKELEY, et al., Defendants.**

**No. C01–0663SI.**

United States District Court, N.D. California.

Nov. 15, 2001.

Peter A. Wald, Stephan E. Klein, Jan-isL. Workman, Randall T. Kim, Latham & Watkins, San Francisco, CA, David R. Goodnight, Rita Latsinova, Dorsey & Whitney, LLP, Seattle, WA, for Plaintiff.

William M. Marticorena, Jeffrey Melching, Rutan & Tucker, Costa Mesa, CA, Manuela Albuquerque, Zach Cowan, Bruce Soublet, Berkeley City Atty's Office, Berkeley, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND CLAIM FOR RELIEF

ILLSTON, District Judge.

On November 9, 2001, the Court heard argument on defendants' motion to dismiss plaintiff's second claim for relief. Having carefully considered the arguments of the parties and the papers submitted, the Court hereby GRANTS defendants' motion to dismiss for the reasons set forth below.

## BACKGROUND

Plaintiff Qwest Communications Corporation ("Qwest") is a telephone company defined as a public utility under California Public Utilities Code § 216. First Amended Complaint ("FAC") ¶ 4. The California Public Utilities Commission ("PUC") has granted Qwest certificates of public convenience and necessity ("CPCN") to provide interexchange, or long distance, telecommunication services. Id. Qwest provides broadband Internet-based data, voice and image connectivity to businesses, consumers and other communications service providers. Id. at ¶ 28.

In December 1999, Qwest won a competitive bidding process and entered into a government contract to provide faster and expanded telecommunications capacity to the Lawrence Berkeley National Laboratory ("LBN Laboratory"). Id. at ¶ 30. LBN Laboratory is the technical administrator and central hub of a program operated by the United States Department of Energy ("DOE") known as the Energy Sciences Network ("ESNET"). Richeson Decl. ¶ 7. The ESNET is a high-speed communication network that allows Department of Energy researchers and collaborators throughout the nation access to a community of research facilities, resources and information. FAC at ¶¶ 3–5.

In order to upgrade LBN Laboratory's telecommunications capacity, Qwest must install a "local loop" between LBN Laboratory and Qwest's central system. Id. at ¶ 31; Richeson Decl. ¶ 10. This involves constructing a conduit—"a pipeline of sorts"—through which fiber optic cable is

strung. FAC at ¶ 32. Sometime in March 2000, Qwest began to formulate a construction plan to lay its conduit through public rights-of-way in the City of Berkeley ("City" or "Berkeley"). *Id.* at ¶ 32. Qwest met and communicated with city officials from April through December 2000 to negotiate an acceptable construction plan to encroach upon the City's public rights-of-way. *See id.* at ¶¶ 33, 35, 41–45. The parties were unable to agree, and Qwest consequently did not obtain the necessary permits to begin construction. Qwest claims that the City refused to process its application after July 10, 2000, pursuant to a *de facto* moratorium on telecommunications infrastructure construction pending enactment of an ordinance affecting installation of telecommunication services in Berkeley. *Id.* at ¶¶ 35–40.

On December 22, 2000, Berkeley enacted Ordinance No. 6608–N.S. (codified at Berkeley Municipal Code §§ 16.10 et seq.) (the "Ordinance"), effective January 21, 2001. *Id.* at ¶ 46. On January 23, 2001, the City passed a Fee Schedule to accompany the Ordinance. *Id.* at ¶ 48. The City's new Ordinance created a comprehensive scheme intended "to more specifically regulate Telecommunications carriers providing telecommunications services using public rights of ways and other public property." Ordinance § 16.10.010 (attached at FAC, Ex. B).

The Ordinance applied to all telecommunications carriers seeking to encroach upon Berkeley's public rights-of-way to provide telecommunication services. Ordinance § 16.10.030. All carriers were required first to obtain registration and pay related registration fees, which must be updated annually. *Id.* at § 16.10.040; *see also* Fee Schedule 2–3 (attached at FAC, Ex. C). All carriers were also required to obtain a Special Telecommunications Permit pursuant to § 16.10.050 of the Ordinance and pay additional fees. *See also*

Fee Schedule 3–4. Unless a carrier claimed exemption under § 16.10.070, and the City affirmatively determined that an exemption indeed applied, all carriers were subject to a franchise fee to provide telecommunications services using the City's public rights-of-way. *See also id.* 5–7.

Qwest filed this lawsuit against the City of Berkeley on February 13, 2001, seeking primarily to invalidate the new Ordinance and Fee Schedule pursuant to the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, and the "conflict with general laws" provision of the California Constitution. Cal. Const. art. XI, § 7. According to Qwest, Berkeley's Ordinance is preempted by the Federal Telecommunications Act of 1996 ("FTA"), 47 U.S.C. §§ 253(a) and (c), the California Public Utilities Code §§ 7901 and 7901.1, and the California Government Code § 50030. Qwest also asserts a claim of intentional interference with contractual relationship.

On May 23, 2001, this Court enjoined Berkeley from enforcing the Telecommunications Carriers Ordinance, Berkeley Municipal Code § 16.10 et seq., and its accompanying Fee Schedule, pending resolution of this lawsuit. *Qwest Communications Corp. v. City of Berkeley,* 146 F.Supp.2d 1081 (N.D.Cal.2001). Soon afterwards, Berkeley passed Resolution No. 61,102–N.S., adopting Ordinance No. 6630–N.S. and its accompanying Fee Schedule to regulate telecommunications companies "pending resolution of the legality of the City's current telecommunication ordinance." FAC, Ex. D. ("Interim Ordinance"). Qwest finds fault with a number of provisions of this Interim Ordinance and Fee Schedule, and maintains that, like its predecessor, it imposes an unlawful "third tier" of regulation that is prohibited by both the FTA and the California Public Utilities Code. *See* Pl.'s Opp'n 2:23–25.

In its brief in opposition to the first motion to dismiss, Qwest indicated that it was not attempting to state a claim directly under section 253 of the FTA. Instead, Qwest explained that it was stating a claim under the Supremacy Clause, alleging that Berkeley's Ordinance was preempted by the FTA. *See Pl.'s Opp'n to Mot. to Dismiss,* 7:3–6. The Court denied defendants' motion to dismiss the federal preemption claim based in large part upon the Ninth Circuit's recent holding in *City of Auburn v. Qwest Corporation,* 260 F.3d 1160 (9th Cir.2001), which clarified that the Supremacy Clause provides an independent basis for challenging local ordinances that purportedly violate the FTA. *See Qwest Communications Corp.,* 146 F.Supp.2d 1081. On August 7, 2001, Qwest filed a First Amended Complaint asserting new challenges to the Interim Ordinance and Fee Schedule and adding new claims. Among them was the new second claim which attempts to state a claim directly under FTA §§ 253(a) and (c). Before the Court is Berkeley's motion to dismiss that second claim. Berkeley contends that there is no private right of action under §§ 253(a) or (c).[1]

## LEGAL STANDARD

Berkeley seeks dismissal of the second claim for relief under § 253 of the FTA pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(6) requires that a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94

S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *United States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir. 1981).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir.2000) (citations and internal quotation marks omitted).

## DISCUSSION

Qwest's second claim for relief attempts to state a claim directly under 47 U.S.C. § 253. Section 253 provides as follows, in pertinent part:

(a) In general: No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority: Nothing in this section shall affect the ability of a State to impose, on a competitively neu-

---

**1.** In its opposition to this motion to dismiss, Qwest argues that its fourth claim for relief under section 1983 should not be dismissed. *See* Pl.'s Opp'n 9:16 – 13:18. Berkeley has not moved to dismiss that fourth claim. *See*

Defs.' Reply 12:13 – 13:1. For that reason, the Court limits its analysis to the question of whether a private right of action exists directly under § 253.

tral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority: Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) Preemption: If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

Qwest claims that Berkeley's Ordinances create barriers to entry and impose requirements on telecommunications carriers which prohibit the ability of an entity to provide interstate or intrastate telecommunications services in violation of § 253(a). FAC ¶¶ 90–91. Further, Qwest claims that the Ordinances and Fee Schedules impose requirements that are not reasonably related to the legitimate local interest in the management of the public rights-of-way and impose fees that are not "fair and reasonable compensation" and are not tied to the recovery of reasonable and actual costs incurred in managing access in violation of § 253(c). *Id.* at ¶¶ 92–93.

No express authority for a private right of action appears anywhere in § 253. Relying largely upon two recently decided cases from other circuits, Qwest argues that a private right of action should be implied. *See Bellsouth Telecommunications, Inc. v. Town of Palm Beach*, 252 F.3d 1169 (11th Cir.2001); *TCG Detroit v. City of Dearborn*, 206 F.3d 618 (6th Cir. 2000). It has not yet been resolved within this circuit whether a private right of action exists under §§ 253(a) or (c).[2]

### 1. Structure of § 253

As a preliminary matter, it is worth noting that § 253 is not a model of clarity. Courts that have sought to interpret the section have noted the questions raised by its wording and structure. *See, e.g., Town of Palm Beach*, 252 F.3d at 1187 ("The confusion arises because of the perceived inconsistencies within the structure of the statute."); *Cablevision of Boston, Inc. v. Public Improvement Commission of the City of Boston*, 184 F.3d 88, 99 (1st Cir. 1999) ("[Section] 253(d) raises more questions than it answers").

Therefore, before determining whether a private right of action exists under either subsection (a) or (c), it is important to understand the structure of the statute itself. Subsection (a) and subsection (c) have different functions. Subsection (a) is the "heart" of § 253, prohibiting state and local governments from passing laws or other regulations that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or

---

**2.** Two other district courts within this circuit have addressed the issue, reaching opposite conclusions. In *GST Tucson Lightwave, Inc. v. City of Tucson*, 950 F.Supp. 968 (D.Ariz. 1996), the court found that no private right of action exists under § 253(c). In contrast, a court in the Central District of California recently found that a private right of action exists under 253(c), but not under (a) or (b). *Pacific Bell Tel. Co. v. City of Hawthorne*, No. CV–01862 CBM, 2001 WL 1800916, —— F.Sup.2d —— (C.D.Cal. June 1, 2001).

intrastate telecommunications service." 47 U.S.C. § 253(a). *See also Town of Palm Beach*, 252 F.3d at 1186. Subsections (b) and (c), on the other hand, are framed as exceptions to the general prohibition stated in subsection (a), giving states and localities authority to retain some control over telecommunication service, provided that they act in a nondiscriminatory and competitively neutral manner. Both subsections are framed similarly. Subsection (b) begins with the phrase "Nothing in this section shall affect . . .," and subsection (c) begins with the phrase "Nothing in this section affects. . . ."

The Ninth Circuit has recognized that subsection (c) should be interpreted as a "safe harbor" for localities. The court described the structure of § 253 as follows:

> Section 253 begins with a broad prohibition against state and local regulation followed by certain narrow exceptions that leave a "safe harbor" for limited local regulation. One of these safe harbors, established by § 253(c), allows a local government to manage and collect fees for the use of public rights-of-way by telecommunication providers.

*City of Auburn*, 260 F.3d at 1170. Moreover, the FCC has interpreted the statute in this manner. In 1998, the FCC issued "Suggested Guidelines for Petitions for Ruling under Section 253 of the Communications Act."[3] The FCC stated:

> In preparing their submissions, parties should address as appropriate all parts of section 253. In particular, parties should first describe whether the challenged requirement falls within the proscription of section 253(a); if it does, parties should describe whether the requirement nevertheless is permissible

under other sections of the statute, specifically sections 253(b) and (c). *See also In re TCI Cablevision of Oakland County, Inc.*, 12 F.C.C.R. 21396 (F.C.C. 1997) ("[S]ection 253(c) preserves the authority of state and local governments to manage public rights-of-way.").

The enforcement clause of § 253 is set out in subsection (d). That provision allows for preemption by the FCC of any statute, ordinance, or regulation that "violates" subsections (a) or (b). 47 U.S.C. § 253(d). Notably, subsection (c) is absent from this enforcement clause. The Eleventh Circuit attached substantial significance to this fact in determining that private parties could bring suit in federal court to challenge alleged violations of statutes, ordinances, or regulations that purport to address the management of public rights-of-way. *See Town of Palm Beach*, 252 F.3d 1169, 1191.

## 2. Existence of a Private Cause of Action

The Supreme Court has set forth the factors relevant to determining whether a private remedy is implicit in a statute not expressly providing one. The factors are: (1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether any explicit or implicit indication of legislative intent exists to create or deny a remedy; (3) whether implication of a remedy would be consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, making the inference of a cause of action solely under federal law inappropriate. *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[4]

---

**3.** http://www.fcc.gov/Bureaus/Common—Carrier/Public—Notices/1998/fcc98295.txt.

**4.** The Ninth Circuit has noted that courts have been reluctant to find a private right of

action under the Federal Communications Act, to which the Federal Telecommunications Act of 1996 is an amendment. *See Maydak v. Bonded Credit Co., Inc.*, 96 F.3d 1332, 1333 (9th Cir.1996). In *Maydak*, the Ninth

Because Qwest appears to be seeking to state a claim under both §§ 253(a) and (c), it is necessary to evaluate each subsection separately.

### A. § 253(a)

■ First, because § 253 is aimed at removing barriers to provision of interstate or intrastate telecommunications service, it is fairly clear that Qwest, as a telecommunications provider, is one of the class for whose benefit § 253(a), the "heart" of § 253, was enacted.[5]

As to the second factor, the Court is not convinced that the legislative history of § 253 evinces an intent by Congress to create a private cause of action under § 253(a). The Supreme Court has indicated that the focal point of the *Cort* inquiry is this second factor, evidence of Congressional intent. Courts should search for this evidence primarily within the language and structure of the statute, as well as in the legislative history. *See Thompson v. Thompson*, 484 U.S. 174, 179–180, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

The language of § 253(a) makes no provision for a private right of action. Instead, it provides for enforcement of § 253(a) by the Federal Communications Commission ("FCC") in § 253(d) and § 257, which may indicate an absence of congressional intent that a private right of action be implied under § 253(a). *See GST Tucson*, 950 F.Supp. at 970. Section 253(d) contains an enforcement provision which obliges the FCC to preempt statutes that "violate" subsections (a) and (b). 47 U.S.C. § 253(d). Moreover, § 257 requires the FCC to "identify and eliminate market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information services …" and further requires the agency to undertake periodic reviews of regulations and statutory barriers. 47 U.S.C. § 257(a), (c). *See GST Tucson*, 950 F.Supp. at 970 ("Enforcement of § 253 is provided for in § 253(d) and § 257, further indicating an absence of congressional intent that a private right of action be implied.").

Congress created the FCC "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio…." 47 U.S.C. § 151. As another court in this district has recognized:

> Congress has expressed that the purpose of Chapter 5 of the Telecommunications Act is to regulate interstate and foreign commerce and provide safe and efficient services, to be monitored by the Federal Communications Commission. *See* 47 U.S.C. § 151 (1999). That commission, along with state commissions

---

Circuit stated that "the Supreme Court formulated a presumption against private actions under the Act, stating that the Federal Communications Act of 1934 'did not create new private rights' and that 'private litigants have standing only as representatives of the public interest.'" *Id.* (quoting *Scripps–Howard Radio, Inc. v. Federal Communications Comm'n*, 316 U.S. 4, 14, 62 S.Ct. 875, 86 L.Ed. 1229 (1942)). *See also AT & T Communications of California v. Pacific Bell*, 60 F.Supp.2d 997, 1002 (N.D.Cal.1999) (finding no private right of action for breach of local call terms of interconnection agreement).

5. That said, it can also be argued that members of the public are among the intended beneficiaries of § 253(a) because regulations that "prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service" are likely to limit customer access to these services. Allowing any member of the public to challenge state or local statutes or regulations would create a significant burden on states and localities because it creates the potential for innumerable lawsuits by individuals claiming that state or local statutes or ordinances limited their ability to obtain desired telecommunications services.

such as the CPUC, are generally better able to address telecommunications issues.

*AT & T Communications of California, Inc. v. Pacific Bell,* 60 F.Supp.2d 997, 1002 (N.D.Cal.1999).

As was noted by Judge Noonan, sitting by designation and concurring in *Cablevision of Boston, Inc.,* 184 F.3d 88, 107–109, when Congress intended to create a private right of action under a particular section of the FTA, it did so explicitly. There are a number of other provisions within the statute in which Congress clearly stated that private parties would be entitled to sue. In his concurrence in *Cablevision,* Judge Noonan pointed to three separate provisions of the Telecommunications Act in which Congress clearly allowed for a private remedy in federal court for a violation of the Act. *See* 47 U.S.C. § 274(3); 47 U.S.C. § 258(b); 47 U.S.C. § 252(e)(6). Additionally, § 207 allows any person claiming to be damaged by any common carrier subject to the provisions of the chapter to bring suit for recovery of damages in any federal district court. 47 U.S.C. § 207. In contrast, neither § 253(a) nor (c) gives any indication that Congress intended to authorize private suits.[6]

The third *Cort* factor asks whether it is consistent with the legislative scheme to imply a private right of action. The district court in *TCG Detroit* noted that the Conference Report states that the Act is to provide for a "pro-competitive, de-regula-

tory national policy framework designed to accelerate rapidly private section deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition...." *TCG Detroit,* 977 F.Supp. at 841 (citing H.R.Conf.Rep. No. 104–458, at 113, reprinted in 1996 U.S.C.C.A.N. 124). It may well be that allowing a private right of action would help to promote more rapid deployment of telecommunication services. However, in light of the Court's determination that Congress intended to vest jurisdiction to preempt statutes and ordinances that violate § 253(a) in the FCC and that § 253(c) was intended to be a safe harbor provision, allowing private suits under either subsection does not appear to be consistent with the legislative scheme.

The fourth *Cort* factor asks whether the cause of action is one relegated to state law in an area basically a concern of the states. Congress intended the FTA to be national in scope, and the FTA designates telecommunications as an area of exclusive federal preemption. 47 U.S.C. § 151 *et seq.* While this factor would appear to weigh in favor of implying a private right of action, it is dwarfed by the absence of evidence of legislative intent to do so.

**B. § 253(c)**

■ In evaluating the first *Cort* factor, it is important to note that § 253(c), under the second clause of which Qwest seeks to state a cause of action, is framed as a "safe

---

**6.** The Court notes that § 255, which mandates access by persons with disabilities, expressly provides that there shall be *no* private right of action to enforce its requirements. *See* 47 U.S.C. § 255(f). The Sixth Circuit pointed to this language as an indication that a private right of action was intended under § 253. *See TCG Detroit,* 206 F.3d at 624 ("The resulting implication is that the neighboring section 253(c) ... from which such limiting language is conspicuously absent,

*does* confer such a right.") However, the existence of a provision foreclosing the availability of a private right of action under that unrelated section does not logically suggest that a private right does exist to enforce § 253 in the absence of any other evidence that a private right of action was intended. Taken to its conclusion, this argument would imply that Congress intended to provide a private right of action to enforce *every* provision of the FTA *other than* § 255.

harbor" provision, allowing states to "manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis." 47 U.S.C. § 253(c). *See Town of Palm Beach*, 252 F.3d at 1186–1189; *Cablevision of Boston, Inc.*, 184 F.3d at 98. Remarks made by Senator Hollings provide a clear picture of the origin and purpose of § 253(c):

> When we provided that [subsection (a)], the States necessarily came and said, wait a minute, that sounds good, but we have the responsibilities over the public safety and welfare. We have a responsibility along with you with respect to universal service. So what about that? How are we going to do our job with that overencompassing (sic) general section (a) that you have there. So we [added subsection (b)]. We did not want and had no idea of taking away that basic responsibility for protecting the public safety and welfare and also providing and advancing universal service. So that was written in at the request of the States, and they like it. The mayors came, as you well indicate, and they said we have our rights of way ... and every mayor must control the rights of way. So we wrote [subsection ... (c)] in there.... We have had experience here with the mayors coming and asking us. And this is the response. That particular section (c) is in response to the request of the mayors.

141 Cong.Rec. S8174 (daily ed. June 12, 1995). It is clear, then, that states and localities—not telecommunication providers—were the intended beneficiaries of subsection (c), which was passed in order to provide some room for states and localities to control public rights of way and to be fairly compensated for the use of public property. *See also* 141 Cong.Rec.H 8460 (daily ed. August 4, 1995) (remarks of Representative Stupak).

Second, with regard to evidence of Congressional intent to create a private right of action under § 253(c), the Court has already explained that subsections (b) and (c) should be interpreted as savings clauses, functioning as affirmative defenses to preemption of state or local exercises of authority that would otherwise violate subsection (a). *See Town of Palm Beach*, 252 F.3d at 1187–1188 ("[U]nless one omits the opening phrase in subsections (b) and (c) completely or otherwise inflicts some grave injustice on the rules of English grammar, it is not possible to read these subsections as pronouncing separate limitations that a state or local government could 'violate.' "). It is unlikely that Congress, intending to provide a safe harbor for states and localities in subsection (c), would have intended that the same provision be used as a sword by telecommunications providers to bring suit against those same parties in federal district court. *See Cablevision of Boston, Inc.*, 184 F.3d at 108 (Noonan, J., concurring) ("The language of § 253(c) is so far from the language Congress used when authorizing such suits that only violent wrenching of the text can serve to squeeze such a sense out of it.").[7]

---

7. The amendment that became § 253(c) replaced another proposed amendment, sponsored by Representative Schaefer, that would have provided:

> Notwithstanding section 2(b), no local government may impose or collect any franchise, license, permit or right-of-way fee or any assessment, rental, or any other charge or equivalent thereof as a condition for

operating in the locality or for obtaining access to, occupy, or crossing public rights-of-way from any provider of telecommunications services that distinguishes between or among providers of telecommunications services, including the local exchange carrier....

HR 1555, § 243(e). The wording of the final version of § 253(c) is markedly different, evidencing Congress' intent to allow states and

Courts holding that a private right of action exists to challenge alleged violations of § 253 have relied in large part on the legislative history of subsection (d), the enforcement provision.[8] An initial proposed version of subsection (d) would have required the FCC to "immediately preempt the enforcement" of any statute, regulation, or legal requirement that violated § 253 as a whole. *Town of Palm Beach,* 252 F.3d at 1189. That initial incarnation of subsection (d) clearly mandated that the FCC had jurisdiction to preempt any act in violation of any provision of § 253. However, Senators Feinstein and Kempthorne objected to this version of the subsection and proposed "strik[ing] the authority of the Federal Communications Commission to preempt State or local regulations that establish barriers to entry for interstate or intrastate telecommunications services." 141 Cong.Rec. S8305 (daily ed. June 14, 1995). The two senators seem to have been concerned that the proposed subsection (d) would create a significant burden on city governments. As Senator Feinstein explained:

> That means that cities will have to send delegations of city attorneys to Washington to go before a panel of telecommunications specialist[s] at the FCC, on what may be [a] very broad question of State or local government rights. In reality, this preemption provision is an unfunded mandate because it will create major new costs for cities and for States.

*See* 141 Cong.Rec. S8170 (daily ed. June 12, 1995). These senators felt that the

proper venue for resolving these disputes was the local federal district courts. *Id.* at S8171.

Senator Gorton proposed a second-degree amendment to the Feinstein–Kempthorne amendment, intended to be a compromise provision. Gorton explained that he, like Feinstein and Kempthorne, believed that a city's or county's rules concerning its own street rights-of-way are "a matter of primarily local concern...." 141 Cong.Rec. S8306, S8308 (daily ed. June 14, 1995). His amendment retained FCC jurisdiction over rules relating to universal service or the quality of telecommunications services, which he termed "the very heart of this bill." *Id.* However, the Gorton amendment, which is now embodied in subsection (d), did not allow the FCC to enjoin enforcement of local ordinances setting rules on "how its street rights of way are going to be utilized, whether there are to be above-ground wires or underground wires, what kind of equipment ought to be used in excavations, what hours the excavations should take place...." *Id.* This would explain the absence of subsection (c) from the preemption provision in subsection (d). Those "local concerns," according to Gorton, should be determined in local courts. Further, he explained:

> So my modification of the Feinstein amendment says that in the case of these purely local matters dealing with rights of way, there will not be a jurisdiction on the part of the FCC immediately to enjoin the enforcement of those local ordinances.

\* \* \* \* \* \*

---

municipalities to retain control over local rights-of-way.

**8.** The court in *City of Hawthorne* used largely similar reasoning as the Eleventh Circuit in reaching its conclusion that a private right of action existed under subsection (c). Citing to the Gorton Amendment, the court found that the failure to provide for FCC enforcement of

subsection (c) indicated that Congress intended to create a private right of action to enforce that subsection. *See City of Hawthorne,* N.CV 01–01862 CBM, 2001 WL 1800916, —— F.Supp.2d ——. This Court disagrees with that interpretation of the wording and the legislative history of the statute, as explained below.

[The Gorton Amendment] retains not only the right of local communities to deal with their rights of way, but the right to meet any challenge on home ground in their local district courts.

\* \* \* \* \* \*

The States retain the right under subsection (d) to pass all kinds legislation that deals with telecommunications providers, subject to the provision that they cannot impede competition. The determination of whether they have impeded competition, not by the way they manage trees or rights of way, but by the way they deal with substantive law dealing with telecommunications entities. That conflict should be decided in one central place, by the FCC. The appropriate balance is to leave purely local concerns to local entities, but to make decisions on the natural concerns which are at the heart of this bill in one central place so they can be consistent across the country.

*Id.* Gorton also stated:

There is no preemption ... for subsection (c) which is entitled, "Local Government Authority," and which is the subsection which preserves to local governments control over their public rights of way. It accepts the proposition ... that these local powers should be retained locally, that any challenge to them take place in the Federal district court in that locality and that the Federal Communications Commission not be able to preempt such actions.

141 Cong.Rec. S8213 (June 13, 1995).

In *Town of Palm Beach,* the Eleventh Circuit relied upon this legislative history to conclude that Congress intended to create a private cause of action in federal district court under § 253 to seek preemption of a state or local statute, ordinance, or regulation that purports to address the management of the public rights-of-way. *See Town of Palm Beach,* 252 F.3d at

1191. The court presented no meaningful analysis of the question of whether a private right of action existed, simply setting out the above legislative history and stating in a conclusory fashion that because Senator Gorton indicated that he anticipated challenges to local ordinances in local courts, a private right of action necessarily exists under § 253. Other courts that have determined that a private right of action exists under § 253 have used the same logic. *See, e.g., TCG Detroit v. City of Dearborn,* 977 F.Supp. 836, 840 (E.D.Mich.1997) ("Because Congress anticipated the forum for a challenge to 253(c), it follows *a fortiori* that there is a right to bring such a challenge.")

This Court is unconvinced that the Gorton Amendment can be interpreted as evidence that Congress intended to create a private cause of action to enforce any aspect of § 253. Senator Gorton noted that his amendment was limited: "It does not impact the substance of the first three subsections at all, but it does shift the forum in which a question about these three subsections is decided." 141 Cong. Rec. S8212 (daily ed. June 13, 1995). Nowhere is there any indication that Senator Gorton intended to create any new rights or remedies under § 253.

Indeed, in the absence of any other evidence in the wording of the statute or the legislative history, reliance on Senator Gorton's statements alone to reach the conclusion that a private right of action exists under § 253 would appear to be inconsistent with the overarching goal of that amendment. The main intention of the Gorton amendment appears to have been to immunize localities from FCC review of decisions that he referred to as "purely local matters." It seems highly unlikely that Senator Gorton's amendment, intended to shield local governments from overly burdensome scrutiny or new costs

in their efforts to control their public rights-of-way, would simultaneously but silently create the ability of telecommunication providers and/or individual consumers to file suit against the local governments federal court under § 253(c). Under the FTA, these private plaintiffs would potentially be entitled to damages and attorney's fees, whereas the FCC is only entitled to preempt the challenged ordinance under subsection (d).[9]

Senator Gorton's objective that challenges to local ordinances affecting public rights-of-way take place in a "local forum" does not require finding that Congress intended to create a private right of action under § 253. Alternative means exist allowing for challenges of local ordinances in district courts in the absence of a cause of action arising directly under the statute itself. The Ninth Circuit has recognized that telecommunications providers may bring Supremacy Clause challenges to local ordinances that are purportedly preempted by the FTA. *See City of Auburn*, 260 F.3d 1160. This Court has already allowed Qwest's challenge of the Berkeley ordinance to go forward on that basis. *See Qwest Communications Corp.*, 146 F.Supp.2d 1081. The Court's analysis of the Supremacy Clause claim will almost certainly be the same as any analysis it would have undertaken in adjudicating the proposed claim asserted directly under § 253 itself. Moreover, the remedy available to Qwest under its Supremacy Clause claim, preemption, is identical to the remedy available to the FCC under subsection (d), demonstrating the internal consistency of the existing remedial scheme.

Therefore, the language of the statute, taken in conjunction with the statements of legislators at the time of passage of § 253(c), the proposed amendment it replaced, and the interpretation of the statute by the FCC, convince this Court that Congress did not intend to create a private right of action directly under § 253(c).[10]

## CONCLUSION

Based upon the language of the FTA, its legislative history, and the existing case law on the issue, the Court finds that neither § 253(a) nor § 253(c) creates an express or implied private right of action. The Court therefore GRANTS defendant's motion to dismiss plaintiff's second claim for relief with prejudice [docket # 80].

**IT IS SO ORDERED.**

9. At oral argument on this motion, counsel for Qwest argued that it would be entitled to attorney's fees and monetary damages for lost business opportunities if allowed to state a claim directly under § 253.

10. The same reasoning applies to the third and fourth steps of the *Cort* analysis under § 253(c) as set out above under § 253(a).