778 N.W.2d 452 (2010)
279 Neb. 426
TRACFONE WIRELESS, INC., appellant,
v.
NEBRASKA PUBLIC SERVICE COMMISSION, appellee.
No. S-08-1109.
Supreme Court of Nebraska.
February 12, 2010.
*455 Stephen M. Bruckner and Russell A. Westerhold, of Fraser Stryker, P.C., L.L.O., Omaha, and Mitchell F. Brecher, of Greenberg Traurig, L.L.P., for appellant.
Jon Bruning, Attorney General, and L. Jay Bartel, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.

I. NATURE OF CASE
The Enhanced Wireless 911 Services Act (911 Act)[1] requires wireless telecommunications carriers to collect a surcharge on wireless service for the purpose of implementing enhanced 911 emergency dispatch service, which can be loosely described as providing public safety agencies with identification and location information for wireless 911 callers.[2] The appellant, TracFone Wireless, Inc. (TracFone), is in the business of selling prepaid wireless service. At issue in this appeal is the method by which TracFone should be required to collect the 911 Act surcharge from its prepaid wireless customers.

II. BACKGROUND
The 911 Act expresses
the intent of the Legislature that . . . all users of prepaid wireless services pay an amount comparable to the amount paid by users of wireless services that are not prepaid in support of statewide wireless enhanced 911 service. It is also the intent of the Legislature that whenever possible such amounts be collected from the users of such prepaid wireless services.[3]
Under the 911 Act, the Nebraska Public Service Commission (Commission) is to establish surcharges for prepaid wireless service comparable to the surcharge assessed on other users of wireless services and develop methods for collection and remittance of surcharges from wireless carriers offering prepaid wireless services.[4] The Commission did so in a June 19, 2007, order, providing three preapproved methods that had been established by a previous version of the 911 Act:
a) The wireless carrier shall divide the total earned prepaid wireless telephone revenue received by the wireless carrier within the monthly reporting period by fifty dollars and multiply the quotient by the surcharge amount;

*456 b) The wireless carrier shall collect on a monthly basis the surcharge from each customer's active, prepaid account. A customer with two or more active, prepaid accounts shall be assessed a separate surcharge for each active, prepaid account; or
c) A wireless carrier shall remit the surcharge upon the activation of the active prepaid account and upon each replenishment of additional minutes purchased by the prepaid customer.[5]
The June 19 order also noted that "differences between various prepaid wireless carriers may require additional methods be made available," so it provided that "any prepaid wireless carrier wishing to utilize a method different than the three adopted herein, shall file with the Commission for approval a detailed description of the method it wishes to use."
TracFone filed such a request. TracFone explained that its services were entirely prepaid. Therefore, it proposed to collect a surcharge from each customer to whom it directly sold prepaid wireless service, in an amount equal to 1 percent of the purchase price. TracFone estimated that the average wireless customer spends approximately $50 per month on wireless service and pays a 50-cent surcharge[6]; therefore, a 1-percent surcharge on TracFone customers was, according to TracFone, comparable. TracFone explained that unlike other wireless service providers, TracFone could not deduct a surcharge directly from the customer's account balance, because the customer's prepaid account balance was stored in the customer's telephone, in the possession of the customer. TracFone also noted that it would be unable to collect a surcharge from customers who did not have a positive balance on the collection date, and that customers would be able to evade the surcharge by waiting until after the collection date to recharge their balances.
The Commission rejected TracFone's proposed alternative. The Commission noted that only 10 to 15 percent of TracFone's revenues are attributable to direct sales. The remaining sales of prepaid TracFone wireless service time are made by independent retail stores, such as Wal-Mart and Radio Shack. The Commission concluded that TracFone's proposal would not result in the remittance of surcharges comparable to those established for users of non-prepaid wireless service, because the surcharge would fall only on those users who purchased services directly from TracFone.
TracFone submitted a second proposal. This time, TracFone proposed to collect a 1-percent surcharge on every retail sale of TracFone service. TracFone would collect the surcharge on purchases made directly from it, and when service was purchased from an independent retail vendor, the vendor would collect the surcharge and give it to TracFone, which would in turn remit the surcharge to the 911 Act fund. But the Commission rejected TracFone's second proposal, reasoning that it did not have jurisdiction over retail vendors who were not telecommunications carriers. TracFone was ordered to use one of the three methods approved in the June 19, 2007, order or, if it wished to submit another alternative, use one of the three approved methods in the interim.
TracFone filed a petition for judicial review under the Administrative Procedure Act (APA).[7] The district court agreed *457 with the Commission's rejection of TracFone's proposed methods of collection and found no merit to TracFone's argument that the Commission's established methods of surcharge collection treated prepaid and postpaid wireless carriers differently in violation of federal law. The court affirmed the decision of the Commission.

III. ASSIGNMENTS OF ERROR
TracFone assigns that the district court erred in
(1) determining that TracFone failed to demonstrate that it was impossible for it to collect the surcharge from users of its wireless service who purchase its service through independent retailers;
(2) determining that the 911 Act requires TracFone to pay the surcharge established by the act even though TracFone has no means to collect the surcharge directly from users of its wireless service who purchase its service through independent retailers;
(3) determining that TracFone's first alternative collection method did not comply with the 911 Act;
(4) determining that TracFone's second alternative collection method did not comply with the 911 Act;
(5) relying upon material not found in the record of the Commission to rule that TracFone's second alternative collection method did not comply with the 911 Act;
(6) determining that TracFone should be required to adopt one of the three established methods approved by the Commission for the collection of the 911 Act surcharge; and
(7) determining that the Commission's interpretation of the 911 Act was not preempted by federal law.

IV. STANDARD OF REVIEW
A judgment or final order rendered by a district court in a judicial review pursuant to the APA may be reversed, vacated, or modified by an appellate court for errors appearing on the record. When reviewing an order of a district court under the APA for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[8]
The meaning of a statute is a question of law, and a reviewing court is obligated to reach its conclusion independently of the court below and the administrative agency.[9]

V. ANALYSIS
Because it underlies many of the parties' more specific arguments, we begin with a more complete examination of § 86-457, which establishes how wireless telecommunications carriers are to collect surcharges and remit them to the Commission to fund the implementation of enhanced 911 service. Section 86-457 provides in part:
(1) Each wireless carrier shall collect:
(a) A surcharge of up to seventy cents, except as provided in subdivision (1)(b) of this subsection and as otherwise provided in this section with respect to prepaid wireless service, on all active telephone numbers or functional equivalents every month from users of wireless service and shall remit the surcharge in accordance with section 86-459; or

*458 (b) A surcharge of up to fifty cents, except as otherwise provided in this section with respect to prepaid wireless service, on all active telephone numbers or functional equivalents every month from users of wireless service whose primary place of use is in a county containing a city of the metropolitan class and shall remit the surcharge in accordance with section 86-459.
The wireless carrier is not liable for any surcharge not paid by a customer.
(2) Except as otherwise provided in this section, the wireless carrier shall add the surcharge to each user's billing statement. The surcharge shall appear as a separate line-item charge on the user's billing statement and shall be labeled as "Enhanced Wireless 911 Surcharge" or a reasonable abbreviation of such phrase.
(3) If a wireless carrier, except as otherwise provided in this section, resells its service through other entities, each reseller shall collect the surcharge from its customers and shall remit the surcharge in accordance with section 86-459.
(4) It is the intent of the Legislature that, effective July 1, 2007, all users of prepaid wireless services pay an amount comparable to the amount paid by users of wireless services that are not prepaid in support of statewide wireless enhanced 911 service. It is also the intent of the Legislature that whenever possible such amounts be collected from the users of such prepaid wireless services.
(5) The [C]ommission shall establish surcharges comparable to the surcharge assessed on other users of wireless services and shall develop methods for collection and remittance of such surcharges from wireless carriers offering prepaid wireless services.
(6) The duty to remit any surcharges established pursuant to subsection (5) of this section is the responsibility of the wireless carrier.
As will become evident, the interpretation of § 86-457 is one of the fundamental disagreements between the parties. The Commission argues that subsections (1) through (3) should be read as exclusively applying to traditional "postpaid" wireless services, while subsections (4) through (6) apply to prepaid wireless services such as TracFone's. TracFone disagrees. As explained below, we agree with the Commission.

1. TRACFONE IS REQUIRED TO REMIT SURCHARGES REGARDLESS OF WHETHER THEY ARE DIRECTLY COLLECTED FROM CUSTOMERS
TracFone's first two assignments of error are related. First, TracFone contends that it is impossible for it to collect surcharges directly from its customers. And second, TracFone contends that if it cannot collect a surcharge directly from its customers, it is not required to remit the surcharge. In that regard, TracFone relies on § 86-457(1), which provides in relevant part that a "wireless carrier is not liable for any surcharge not paid by a customer."
But § 86-457(1) imposes surcharges on wireless service customers "except as otherwise provided . . . with respect to prepaid wireless service." And TracFone's argument is contrary to § 86-457(4), which expressly applies to prepaid wireless services and states that comparable surcharges should "whenever possible . . . be collected from the users of such prepaid wireless services." In accordance with that, § 86-457(5) requires the Commission to develop methods for "collection and remittance of such surcharges from wireless carriers offering prepaid wireless services."
*459 We have often said that when construing a statute, we must look to the statute's purpose and give to the statute a reasonable construction which best achieves that purpose, rather than a construction which would defeat it.[10] We look to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served.[11] And we construe statutes relating to the same subject matter together to maintain a sensible and consistent scheme, so that effect is given to every provision.[12]
When this statute is read as a whole, it is apparent that § 86-457(1), upon which TracFone's argument depends, applies to postpaid wireless services, not prepaid wireless services. The evident purpose of providing that a wireless carrier "is not liable for any surcharge not paid by a customer" of postpaid wireless service is to relieve the wireless carrier of responsibility for surcharges owed by wireless customers who do not pay their bills. It was not intended to relieve a wireless carrier of responsibility for remitting surcharges assessed for wireless customers who pay their bills in advance.
Instead, § 86-457(4) provides that surcharges should be collected from prepaid wireless customers "whenever possible"  language that clearly contemplates circumstances in which such direct collection is not possible. Nonetheless, the duty to remit those surcharges remains, pursuant to § 86-457(6), the responsibility of the wireless carrier.
TracFone counters with an attempt to distinguish a duty to "pay" the surcharges with the duty to "remit" the surcharges. TracFone cites no authority for its rather novel interpretation of the word "remit," nor are we aware of any. To "remit" money is simply to transmit or send it as payment.[13] The Legislature's use of the word "remit" to describe a wireless carrier's duty to ensure that the Commission receive the surcharges provides no basis for distinguishing between surcharges collected directly from postpaid wireless customers and surcharges assessed for prepaid wireless service.
TracFone also relies on § 86-459, which requires wireless carriers to remit to the Commission "the amounts collected pursuant to section 86-457." TracFone asserts that § 86-459 reveals the Legislature's intent to require a wireless carrier to remit only surcharges collected directly from customers. But § 86-459 is not limited to amounts collected from customers  it requires remittance of all "amounts collected pursuant to section 86-457," which includes surcharges assessed on prepaid wireless customers pursuant to § 86-457(5).
In sum, TracFone's argument is that if a wireless carrier is unable to collect a surcharge directly from a customer, the Legislature intended for neither the carrier nor the customer to pay it. This is contrary to the stated intent of the 911 Act, and to a commonsense reading of the statutory language. TracFone's choice of business model does not give it license to throw up its hands and pay nothing. Instead, the surcharge should be collected from a wireless carrier's prepaid customers *460 "whenever possible."[14] When that is not possible, a "comparable" surcharge will be assessed by the Commission, and the duty to remit that surcharge is the carrier's responsibility.[15] In this case, it is TracFone's, and TracFone's first and second assignments of error are without merit.

2. COMMISSION DID NOT ERR IN REJECTING TRACFONE'S PROPOSED ALTERNATIVE METHODS OF COLLECTION
TracFone's next two assignments of error are directed at the Commission's rejection of its two proposed alternative methods of collecting the surcharge. We address each proposed alternative in turn.

(a) TracFone's First Proposed Alternative Collection Method Was Inconsistent With § 86-457
TracFone's first proposed alternative collection method was to collect a 1-percent surcharge on the purchase price of each sale of prepaid wireless service purchased directly from TracFone. The Commission rejected this alternative. In arguing that the Commission erred, TracFone relies on § 86-457(4), which, as discussed above, declares the Legislature's intent that surcharges be collected from the users of prepaid wireless services "whenever possible." TracFone asserts that it is only "possible" for it to collect surcharges from its sales directly to customers.
But only 10 to 15 percent of TracFone's sales are direct. TracFone's remaining sales are made through independent retailers, and under TracFone's first proposed alternative collection method, no surcharge would be collected from, or paid for, those sales. This would be contrary to the expressed intent of the Legislature that "all users of prepaid wireless services pay an amount comparable to the amount paid" by other wireless customers.[16] As discussed above, TracFone is not relieved of the responsibility for remitting the surcharge, regardless of whether it is "possible" to collect the surcharge directly from its customers. Therefore, the Commission did not err in rejecting this proposed alternative, and TracFone's assignment of error to the contrary is without merit.

(b) TracFone's Second Proposed Alternative Collection Method Was Outside Commission's Jurisdiction
TracFone's second proposed alternative collection method was essentially a supplemented version of the first. TracFone proposed to collect a 1-percent surcharge on the purchase price of each sale of prepaid wireless service purchased directly from TracFone and require its third-party vendors to collect a 1-percent surcharge from users at the point of sale, which would be remitted to TracFone for remittance to the Commission. The Commission rejected this alternative as being outside its regulatory authority.
The Commission's jurisdiction extends to a wide variety of commercial activities: common carriers; grain dealing and storage; manufactured homes, modular housing units, and recreational vehicles; motor carrier registration and safety; pipeline carriers and rights-of-way; railroad carrier safety; telecommunications carriers; transmission lines and rights-of-way; water service; and certain natural gas public utilities.[17] Nothing in § 75-109.01 gives the Commission jurisdiction over third-party vendors that do not fall within those *461 categories. TracFone does not argue otherwise.
Instead, TracFone's argument rests entirely upon § 86-457(3), which provides that if a wireless carrier "resells its service through other entities, each reseller shall collect the surcharge from its customers and shall remit the surcharge" to the Commission. The 911 Act does not define "reseller." TracFone argues that its third-party vendors are "resellers" within the meaning of § 86-457(3).
But as explained above, § 86-457(3) applies to postpaid wireless services, not prepaid wireless services such as TracFone's. And contrary to TracFone's second proposal, § 86-457(3) requires resellers, not the initial wireless carrier, to remit surcharges to the Commissionrequiring the Commission to exercise jurisdiction over the reseller. There is simply no indication that § 86-457(3) was intended to extend the Commission's jurisdiction to every gas station or grocery store that sells a prepaid calling card.
And the legislative history of the 911 Act buttresses this conclusion, indicating that the Legislature intentionally "omit[ted] any reference to collection of the surcharge by the retail industry who resells this prepaid wireless service," because it "did not believe that the ... Commission should have the authority over the retail industry to collect a telecommunications surcharge."[18] The legislative history explains that under § 86-457(3), "[i]f a carrier resells its service, each reseller shall collect the surcharge, except with respect to resellers of prepaid service, which are addressed in a later subsection."[19] And in that later subsection, § 86-457(6), the Legislature struck proposed language "authorizing the collection from an entity that resells the prepaid wireless service, and insert[ed] a provision that the duty to remit the surcharge is the responsibility of the wireless carrier."[20]
Because TracFone's second proposed alternative was beyond the Commission's authority to adopt or enforce, the Commission did not err in rejecting it. We find no merit to TracFone's fourth assignment of error.

3. DISTRICT COURT DID NOT ERR IN CONSIDERING LEGISLATIVE HISTORY
The district court, like this court, found the legislative history of the 911 Act to support its construction of the statute. TracFone argues that because under the APA, "the agency record shall constitute the exclusive basis for agency action in contested cases under the act and for judicial review thereof,"[21] the district court could not consult materials outside the record. And TracFone argues that the legislative history was an "adjudicative fact,"[22] which we have said a district court cannot judicially notice in reviewing an administrative order.[23] TracFone also contends that the district court erred in referring to Federal Communications *462 Commission reference materials for definitions of words in the statute.
But we have never construed the APA to preclude a district court from researching the law, for obvious reasons. And the legislative history of a statute is not an adjudicative fact within the meaning of Neb. Evid. R. 201. "Adjudicative facts" within the meaning of rule 201 are simply the facts developed in a particular case, as distinguished from "legislative facts," which are established truths, facts, or pronouncements that do not change from case to case but apply universally.[24] The adjudicative facts are those to which the law is applied in the process of adjudication.[25] Legislative history is among the most literally "legislative" of facts, and it is well established that it is judicially noticeable by this court and by the district court in an administrative proceeding.[26]
TracFone also argues that the court should not have considered legislative history, because § 86-457(3) is unambiguous.[27] As we explained above, however, neither the plain language of § 86-457 nor the legislative history supports TracFone's position. Therefore, the distinction is not a meaningful one.
In short, the district court did not err in conducting legal research or consulting legislative history. We find no merit to TracFone's fifth assignment of error.

4. COMMISSION DID NOT ERR IN REQUIRING TRACFONE TO USE COLLECTION METHOD PROVIDED IN JUNE 19, 2007, ORDER
In its order rejecting TracFone's second proposed alternative collection method, the Commission ordered TracFone to "immediately adopt and utilize one of the three established methods set forth in the June 19, 2007 order." The Commission ordered TracFone, if it wished to propose another alternative method, to "continue to utilize one of the three previously adopted methods ... pending Commission approval of any alternative method it may propose."
TracFone asserts that the Commission's order runs contrary to the Legislature's purported intent to permit collection methods other than the three adopted by the Commission, which three had previously been required by statute, then repealed in favor of the Commission's regulatory process.[28] But, to begin with, we see nothing in the statute that requires the Commission to permit wireless carriers to suggest their own methods of collecting surcharges. Instead, the statute simply requires the Commission to establish surcharges and develop methods for collection and remittance.[29] The plain language of § 86-457(5) permits the Commission to require compliance with the surcharges and methods for collection and remittance that it establishes.
And more to the point, § 86-457(4) declared the Legislature's intent that users of prepaid wireless services pay a comparable surcharge effective July 1, 2007. By the time the Commission rejected TracFone's second proposed alternative, it was April 22, 2008, and the litigation was still ongoing. The Commission was entitled to require TracFone to comply with § 86-457 in some way, and was not required *463 to wait until TracFone finally (if at all) found a mutually acceptable alternative for doing so. Nor, even now, has TracFone proffered an alternative better than the two methods that the Commission correctly rejected, making it difficult to conclude that TracFone was prejudiced by the Commission's directive to comply with its June 19, 2007, order in the meantime.
In short, nothing in § 86-457 required the Commission to wait for TracFone to exhaust its ingenuity before compelling it to comply with the 911 Act. We find no merit to TracFone's sixth assignment of error.

5. COMMISSION'S DETERMINATION IS NOT PREEMPTED BY FEDERAL LAW
Finally, TracFone argues that the Commission's determination is preempted by federal law. The federal Telecommunications Act of 1996 provides in part:
(a) In general
No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.
(b) State regulatory authority
Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.
(c) State and local government authority
Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.
(d) Preemption
If, after notice and an opportunity for public comment, the [Federal Communications] Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the [Federal Communications] Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.[30]
TracFone argues that the Commission's order has the effect of prohibiting its ability to provide telecommunications service, and is not competitively neutral, so the order is expressly preempted by Congress' explicit declaration.[31]
We explained in In re Application of Lincoln Electric System that § 253(a) imposes a substantive limitation on state and local governments, while § 253(b) and (c) are "safe harbors" or exceptions to the general prohibition stated in § 253(a).[32] This means that the "safe harbor" provisions of subsections (b) and (c) are affirmative defenses to preemption of state and local exercises of authority that would otherwise violate subsection (a), and are not *464 implicated unless a regulation is determined to be prohibitive in the first place.[33]
And TracFone has not demonstrated that the 911 Act, or the Commission's implementation of it, is prohibitive. Although TracFone claims that it is only required to demonstrate "a possible prohibition on the provision of services,"[34] more recent federal authority recognizes that under the plain language of § 253(a), to demonstrate preemption, a party must show actual or effective prohibition, rather than the mere possibility of prohibition.[35] No such showing was made here. Section 253(a) has been held to be violated by circumstances such as outright prohibition of telecommunications service,[36] a significantly burdensome application process,[37] an extensively delayed application process,[38] or the imposition of costs and fees that would reduce the carrier's profit by 86 percent.[39] This case presents nothing comparable.
TracFone argues that it suffers from an "inequitable competitive marketplace" because it is required "to pay the Surcharge `out of pocket' when its competitors collect the Surcharge from their customers through billed line items which are clearly identified as being government-imposed charges, thereby suffering no adverse economic consequence."[40] But nothing prevents TracFone from recouping the surcharge from its customers or retailers, or explaining its prices to them. We are not entirely convinced that consumers are persuaded by such line items to overlook the bottom-line price that they have to pay for wireless service. A potential customer's choice to purchase from TracFone's competition is not a prohibition of TracFone's ability to provide telecommunications service.[41]
We find nothing in the record to suggest that TracFone was prohibited from providing telecommunications service within the meaning of § 253(a). Having reached that conclusion, we need not consider other complicated questions implicated by TracFone's argument, such as whether the 911 Act is competitively neutral within the meaning of § 253(c), whether private parties have a right to enforce § 253, and whether the doctrine of primary jurisdiction should apply.[42] We find no merit to TracFone's final assignment of error.

*465 VI. CONCLUSION
The Commission did not err in its construction of the 911 Act, in its rejection of TracFone's proposed alternative collection methods, or in requiring TracFone to comply with its approved collection methods pending approval of any other proposal. The district court did not err in affirming those conclusions, nor did the court err in relying on legal research and legislative history in doing so. And neither the 911 Act nor the Commission's application of it is preempted by federal law. Therefore, we affirm the judgment of the district court.
AFFIRMED.
NOTES
[1] Neb.Rev.Stat. §§ 86-442 to 86-470 (Reissue 2008).
[2] See §§ 86-448 and 86-463.
[3] § 86-457(4).
[4] See § 86-457(5).
[5] Compare, 2007 Neb. Laws, L.B. 661, § 23; 2006 Neb. Laws, L.B. 1222, § 8.
[6] See § 86-457(b).
[7] See Neb.Rev.Stat. §§ 84-901 to 84-920 (Reissue 2008 & Supp. 2009). See, also, Neb. Rev.Stat. § 75-136 (Reissue 2009).
[8] Children's Hospital v. State, 278 Neb. 187, 768 N.W.2d 442 (2009).
[9] See Holmes v. State, 275 Neb. 211, 745 N.W.2d 578 (2008).
[10] See Gilbert & Martha Hitchcock Found. v. Kountze, 272 Neb. 251, 720 N.W.2d 31 (2006).
[11] See Premium Farms v. County of Holt, 263 Neb. 415, 640 N.W.2d 633 (2002).
[12] See Deuth v. Ratigan, 256 Neb. 419, 590 N.W.2d 366 (1999).
[13] See Black's Law Dictionary 1409 (9th ed. 2009).
[14] See § 86-457(4).
[15] See § 86-457(5) and (6).
[16] See § 86-457(4).
[17] See Neb.Rev.Stat. § 75-109.01 (Reissue 2009). See, also, Neb.Rev.Stat. § 66-1802(13) (Reissue 2009).
[18] Floor Debate, L.B. 661, Transportation and Telecommunications Committee, 100th Leg., 1st Sess. 12-13 (Mar. 8, 2007).
[19] Committee Statement, L.B. 661, Transportation and Telecommunications Committee, 100th Leg., 1st Sess. 3 (Jan. 30, 2007) (emphasis supplied).
[20] Id. at 4.
[21] § 84-915.01(4).
[22] See Neb. Evid. R. 201, Neb.Rev.Stat. § 27-201 (Reissue 2008).
[23] See, e.g., Becton, Dickinson & Co. v. Nebraska Dept. of Rev., 276 Neb. 640, 756 N.W.2d 280 (2008).
[24] Hagelstein v. Swift-Eckrich, 257 Neb. 312, 597 N.W.2d 394 (1999).
[25] Id.
[26] See Dairyland Power Co-op. v. State Bd. of Equal., 238 Neb. 696, 472 N.W.2d 363 (1991).
[27] See, e.g., Scofield v. State, 276 Neb. 215, 753 N.W.2d 345 (2008).
[28] See L.B. 661.
[29] See § 86-457(5).
[30] 47 U.S.C. § 253 (2006).
[31] See In re Application of Lincoln Electric System, 265 Neb. 70, 655 N.W.2d 363 (2003), overruled on other grounds, Nixon v. Missouri Municipal League, 541 U.S. 125, 124 S.Ct. 1555, 158 L.Ed.2d 291 (2004).
[32] Id.
[33] See, Puerto Rico v. Municipality of Guayanilla, 450 F.3d 9 (1st Cir.2006); Qwest Corp. v. City of Santa Fe, New Mexico, 380 F.3d 1258 (10th Cir.2004); BellSouth Telecommunications v. Town of Palm Beach, 252 F.3d 1169 (11th Cir.2001); Qwest Communications v. City of Berkeley, 202 F.Supp.2d 1085 (N.D.Cal.2001).
[34] Brief for appellant at 39 (emphasis in original). See City of Auburn v. Qwest Corp., 260 F.3d 1160 (9th Cir.2001), overruled, Sprint Telephony PCS, L.P. v. County of San Diego, 543 F.3d 571 (9th Cir.2008) (en banc), cert. denied ___ U.S. ___, 129 S.Ct. 2860, 174 L.Ed.2d 576 (2009).
[35] See, Sprint Telephony PCS, L.P., supra note 34; Level 3 v. City of St. Louis, Mo., 477 F.3d 528 (8th Cir.2007).
[36] See In re Application of Lincoln Electric System, supra note 31.
[37] See City of Santa Fe, New Mexico, supra note 33.
[38] See TCG New York, Inc. v. City of White Plains, 305 F.3d 67 (2d Cir.2002).
[39] See Puerto Rico, supra note 33.
[40] Brief for appellant at 40.
[41] See Time Warner Telecom of Oregon v. City of Portland, 452 F.Supp.2d 1103 (D.Or.2006).
[42] See, e.g., Puerto Rico, supra note 33; City of Santa Fe, New Mexico, supra note 33; TCG New York, Inc., supra note 38; BellSouth Telecommunications, supra note 33; City of Berkeley, supra note 33.