Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/19/2019 09:07 AM CST

- 773 -

**Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports**
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

In re Application No. C-4981
of Beau Toben.
Windstream Communications, Inc., appellant,
v. Nebraska Public Service Commission
et al., appellees.
___ N.W.2d ___

Filed November 19, 2019.    No. A-19-054.

1. **Public Service Commission: Appeal and Error.** Under Neb. Rev. Stat. § 75-136(2) (Reissue 2018), an appellate court reviews an order of the Nebraska Public Service Commission de novo on the record.

2. **Appeal and Error.** In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue.

3. **Administrative Law: Appeal and Error.** When an appellate court makes a de novo review, it does not mean that the court ignores the findings of fact made by the agency and the fact that the agency saw and heard the witnesses who appeared at its hearing. Where the evidence is in conflict, the appellate court will consider and may give weight to the fact that the agency hearing examiner observed the witnesses and accepted one version of the facts rather than another.

4. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.

5. ____: ____. In examining the language of a statute, its language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

6. **Statutes: Legislature: Intent.** A court may inquire into legislative history when a statute is open to construction because its terms require interpretation or may reasonably be considered ambiguous.

7. **Statutes: Appeal and Error.** When construing a statute, an appellate court must look to the statute's purpose and give to the statute a

- 774 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

reasonable construction which best achieves that purpose, rather than a construction which would defeat it.

8. **Statutes: Intent: Appeal and Error.** In construing a statute, an appellate court looks to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served.

9. **Statutes: Appeal and Error.** An appellate court construes statutes relating to the same subject matter together to maintain a sensible and consistent scheme, so that effect is given to every provision.

10. **Administrative Law: Appeal and Error.** It is appropriate, even under a de novo standard of review, to adhere to the common practice among appellate courts to afford appropriate deference to the findings of the agency before which the record was created.

Appeal from the Public Service Commission. Affirmed.

Blake E. Johnson and Katherine J. Spohn, of Bruning Law Group, for appellant.

Douglas J. Peterson, Attorney General, and L. Jay Bartel for appellee Nebraska Public Service Commission.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Beau Toben filed an application with the Nebraska Public Service Commission (PSC) seeking advanced telecommunications service, or broadband service, for a home he was building a few miles west of Doniphan, Nebraska. Toben claimed he was not receiving, and would not within a reasonable time receive, such service through the "Hansen Exchange" of Windstream Communications, Inc. (Windstream). He wished to modify his exchange service area so he could receive such service from the "Doniphan Exchange" of Hamilton Telecommunications (Hamilton). The PSC granted Toben's application to revise the exchange boundaries. Windstream appeals, claiming the PSC was not authorized to grant the application because the evidence showed that Windstream would provide reasonable advanced telecommunications service within a reasonable

time pursuant to Neb. Rev. Stat. § 86-136(1) (Reissue 2014). We affirm.

## BACKGROUND

On April 18, 2018, Toben, pro se, filed an application with the PSC, alleging he resided within Windstream's Hansen Exchange, but he wished to receive advanced telecommunications service from Hamilton's Doniphan Exchange. The PSC notified Windstream and Hamilton of Toben's application. Hamilton consented to Toben's request to be served by its Doniphan Exchange at no direct cost for construction and installation; Windstream objected because it had plans to deploy broadband service and "serve [Toben] within a reasonable period of time." A hearing took place before the PSC in November 2018. Toben appeared pro se, Windstream appeared with counsel, and a representative appeared on behalf of the PSC. Hamilton did not appear. A summary of the evidence from the hearing follows.

Toben testified that he did not have any service from Windstream (or any other local exchange carrier) for a new house he was building a few miles west of Doniphan. There were neither any Windstream lines buried there, nor "land service." He offered photographs of Windstream's equipment (presumably on his property) showing "line boxes" for their telephone service that "had been in disrepair for the last years [and] nobody has ever serviced [them]." He cited the "lack of maintenance or advancements to the services in [his] area" as one reason for his application. Toben hoped to move into his house by the end of 2018, but indicated installation of broadband service may interfere with finishing the yard and "dirt work" if "things" would have to be buried under his house. At the time of the hearing, Toben said, "[W]here I live I have Hamilton," and he had internet service through Hamilton. According to Toben, Hamilton "buried fiber optics to the area" in 2016, which was why he applied for the boundary change to his new home. He testified, "We are building a

- 776 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

new house where there is currently not any service," which he clarified meant no service from anyone, including Hamilton. Toben had contacted Hamilton, and "they [were] willing to provide [him] with Internet service," but Toben acknowledged such service was not currently available through Hamilton. Toben said Hamilton was willing to provide him with internet service and that it could offer speeds of "Ten Mbps." Toben was "hoping to be moved in [to the new house] by the end of the year [2018]." When asked where he was currently living, he indicated he was at his parents' address "while we are building our house."

Regarding his communications with Windstream, Toben said he was told that he would not be able to receive "land service," only (fixed) wireless service; Windstream explained in an email to Toben that "fixed wireless" is a system to provide "high speed internet" by way of a "point to multi-point wireless technology that uses radio frequencies." Toben had not had any experience with fixed wireless service, but was willing to give it a "chance." However, he did not receive service "in the time that was promised." Windstream had indicated in a July 13, 2018, email to Toben that it expected to complete its project to provide fixed wireless service to Toben's area in "the first few weeks of September 2018." On July 20, Windstream sent an email about servicing Toben's new house with "the fixed wireless solution" and was "hopeful" to avoid a hearing if possible. On July 26, Toben emailed the PSC asking to postpone a hearing scheduled in August so he could "see if the fixed wireless system that Windstream has planned will be sufficient." In September, Toben contacted Windstream and was told someone would "get back to [him] within a couple of days." After he did not hear from Windstream, Toben rescheduled the hearing.

Brad Hedrick, Windstream's president of operations for Nebraska and four other states, testified that Windstream wanted to expand its broadband services across rural service areas. He explained that Windstream's fixed wireless

- 777 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

technology was a "much improved version over what other providers ha[d] deployed in these areas in the past." Windstream's fixed wireless system had not been deployed anywhere in Nebraska yet.

Windstream intended to serve Toben with fixed wireless service. Hedrick stated that Toben's new house address was within Windstream's Hansen Exchange, but Windstream had yet to complete two towers in the "Doniphan-Hansen area" that would allow Toben to receive service. Once completed, those towers would provide a service range extending out in a radius of about 4 or 5 miles and would allow a "75 to 100 Mbps download." Although Toben had concerns about Windstream's radius because his house "falls on the furthest boundary" of the Hansen Exchange, Hedrick testified that "RF engineering experts" said that Toben would receive "at least 75 Mbps."

Hedrick explained why service had been delayed beyond the initial September timeframe provided to Toben. Hedrick identified two "governmental delays," one of which was related to a rules change by the Federal Communications Commission, but that issue had since been resolved. The outstanding issue, which Windstream was notified of about 2 weeks before the PSC hearing, concerned a zoning dispute with Adams County regarding Windstream's permit application to place poles, or towers, throughout that county. The dispute was about the "location of the site" and whether it was within the "zone or cone of influence of the Hastings Airport." If so, there were alternatives, such as changing the location of the pole or adding "lighting" to the site. According to Hedrick, Windstream was "hopeful" to resolve that issue "soon" and to "deploy service by the end of the year" but that was "not a guarantee." He admitted it was "in the realm of possibility" that the issue could end up in the court system on appeal.

Once the zoning issue was "sorted out," Windstream could begin building and equipping tower sites. Hedrick indicated that Windstream intended to complete other tower

- 778 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

sites (in addition to those in the "Doniphan-Hansen area") with fixed wireless service in the "Sutton exchange [and] the Juniata exchange"; "it would be beneficial to [Windstream] if [it] could do them all at the same time." He thought Harvard, Nebraska, would be the first area to deploy (not the "Doniphan-Hansen area") as it was "approved" the same day as the PSC hearing. Windstream had not yet advertised broadband to Doniphan customers "because it would have been premature since [it did not] have any capability to provide service yet" and the "unknown issue [it was] dealing with in Adams County."

On December 18, 2018, the PSC issued its order. It noted that Hamilton and Windstream are local exchange carriers holding certificates of public convenience and necessity to provide local exchange service in their respective territories. The PSC found that Toben was not receiving, and would not receive within a reasonable time, advanced telecommunications capability service from Windstream. The PSC further found that the revision of the exchange service area was economically sound and would not impair the capabilities of the telecommunications companies affected by the change to serve their subscribers. It acknowledged Toben's willingness to pay construction and other costs related to the boundary change but found that Hamilton was willing to pay those costs. The PSC concluded that the requirements of § 86-136 were met. Therefore, it granted Toben's application and ordered that the exchange boundaries of Hamilton's Doniphan Exchange and Windstream's Hansen Exchange be revised (as detailed in maps attached to the order) in such a way as to allow Toben to receive advanced telecommunications capability service from Hamilton's Doniphan Exchange.

Windstream appeals.

ASSIGNMENT OF ERROR

Windstream claims the PSC erred by determining Toben would not receive reasonable advanced telecommunications

- 779 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

capability service within a reasonable time absent a change of Windstream's Hansen Exchange boundary.

## STANDARD OF REVIEW

[1-3] Under Neb. Rev. Stat. § 75-136(2) (Reissue 2018), an appellate court reviews an order of the PSC de novo on the record. *In re Application No. B-1829*, 293 Neb. 485, 880 N.W.2d 51 (2016). In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue. *Id.* When an appellate court makes a de novo review, it does not mean that the court ignores the findings of fact made by the agency and the fact that the agency saw and heard the witnesses who appeared at its hearing. *In re Application No. OP-0003*, 303 Neb. 872, 932 N.W.2d 653 (2019). Where the evidence is in conflict, the appellate court will consider and may give weight to the fact that the agency hearing examiner observed the witnesses and accepted one version of the facts rather than another. See *id.*

[4] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court. See *In re Application of City of Minden*, 282 Neb. 926, 811 N.W.2d 659 (2011).

## ANALYSIS

The Nebraska Telecommunications Regulation Act is codified at Neb. Rev. Stat. §§ 86-101 through 86-165 (Reissue 2014 & Cum. Supp. 2018). It was passed to fulfill several policies, including to maintain and advance the efficiency and availability of telecommunications services. See § 86-102. As relevant here, § 86-135(1) states, "Any person may file an application with the [PSC] to obtain advanced telecommunications capability service furnished by a telecommunications company in the local exchange area adjacent to the local exchange area in which the applicant resides." "Advanced telecommunications capability service means high-speed, broadband telecommunications capability provided by a local

- 780 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

exchange carrier that enables users to originate and receive high-quality voice, data, graphics, and video communications using any technology." § 86-103.01. A "[l]ocal exchange area" is a "territorial unit established by a telecommunications company for the administration of telecommunications service within a specific area generally encompassing a city or village and its environs as described in maps filed with and approved by the [PSC]." § 86-115. There must be a hearing before the PSC if all of the "directly affected" telecommunications companies involved do not consent to an application. § 86-135(2).

Section 86-136 provides that upon the completion of the hearing on an application made pursuant to § 86-135 (if a hearing is required), the PSC may grant the application, in whole or in part, if the evidence establishes each of the following:

(1) That such applicant is not receiving, and will not within a reasonable time receive, reasonable advanced telecommunications capability service from the telecommunications company which furnishes telecommunications service in the local exchange area in which the applicant resides;

(2) That the revision of the exchange service area required to grant the application is economically sound, will not impair the capability of any telecommunications company affected to serve the remaining subscribers in any affected exchanges, and will not impose an undue and unreasonable technological or engineering burden on any affected telecommunications company; and

(3) That the applicant is willing and, unless waived by the affected telecommunications company, will pay such construction and other costs and rates as are fair and equitable and will reimburse the affected telecommunications company for any undepreciated investment in existing property as determined by the [PSC]. The amount of any payment by the applicant for construction and other costs associated with providing service to the applicant

may be negotiated between the applicant and the affected telecommunications company.

On appeal, Windstream takes issue only with whether § 86-136(1) set forth above was satisfied—specifically, whether advanced telecommunications capability service would be available to Toben within a reasonable time. Windstream claims it would have been able to provide such service to Toben within a reasonable time.

Although not raised by the parties, nor addressed by the PSC in its order, we initially observe that at the time Toben completed his application in April 2018 and at the time of the PSC hearing in November, Toben was residing at his parents' home within Hamilton's Doniphan Exchange. He was not yet residing at the home being built within Windstream's Hansen Exchange. Section 86-135(1) permits a person to file an application with the PSC to seek service from a telecommunications company in the local exchange area adjacent to the local exchange area *in which the applicant resides*. Therefore, in order for the PSC to have concluded as it did, it would necessarily have had to interpret the words "the local exchange area in which the applicant resides" to include property an applicant presently owns and on which the applicant does not presently reside, but has demonstrated an intent to reside on such property in the future. At the PSC hearing, questions were asked about Toben's current residence. Toben acknowledged he was still living in Doniphan, in the Hamilton exchange, but anticipated moving to his new residence in the Windstream exchange at the end of 2018. He testified that he was currently receiving internet service through Hamilton, but that "nobody" provided internet service to the location where he was building his new house. It is evident that at the time of his application and at the time of the PSC hearing, Toben was still residing in Hamilton's Doniphan Exchange. There is also no dispute that when Toben begins residing in the house being built a few miles west of Doniphan, he will then be residing in Windstream's Hansen Exchange; Hedrick agreed

- 782 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

that "[Toben's] new address for the house they are building is within the [Windstream] Hansen exchange." Therefore, the PSC necessarily interpreted the words "the local exchange area *in which the applicant resides*" to include property an applicant presently owns and on which the applicant does not presently reside, but has demonstrated an intent to reside on such property in the future. At the hearing before the PSC, Windstream did not take issue with the fact that Toben did not yet reside on the property in its Hansen Exchange—nor is that issue raised on appeal. Accordingly, it is not necessary for this court to address whether this particular statutory language was properly applied; rather, we address only whether the PSC correctly found that Toben was not receiving, and would not receive within a reasonable time, advanced telecommunications capability service from Windstream for his property within Windstream's Hansen Exchange as set forth in § 86-136(1).

We first observe that the Legislature recently amended § 86-136(1) as follows (new language underscored; former language struck through):

> (1) That such applicant is not receiving, and at the time of the application is not able to receive, ~~will not within a reasonable time receive, reasonable~~ advanced telecommunications capability service from the telecommunications company which furnishes telecommunications service in the local exchange area in which the applicant resides.

2019 Neb. Laws, L.B. 268, § 1 (effective September 1, 2019).

Thus, the issue of what might constitute a reasonable time for a local exchange to make advanced telecommunications capability service available to an applicant residing in its exchange is possibly an issue of last impression. As of its September 1, 2019, effective date, the amended § 86-136(1) places the focus on when the application to change exchange boundaries is filed rather than whether service can be made available within a reasonable time.

- 783 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

As pertinent here, Windstream argues it could fulfill the reasonable time requirement because of plans to provide service by the end of 2018. It asserts that despite unexpected delays, it demonstrated "good faith efforts to provide Toben with internet service quickly" and had "executable designs and plans to build the required service towers." Brief for appellant at 8. But the PSC argues that the record shows "Windstream failed to meet its own promised time frame to provide service." Brief for appellee at 8.

[5] Neither party directs us to a prior appellate case that has had to interpret the meaning of "within a reasonable time" under § 86-136(1) (Reissue 2014), and we find none. We are thus faced with a case of first, and possibly last, impression, although Windstream's brief does indicate there may be other cases of a similar nature pending on appeal: "*In re Application of Skrdlant*, No. A18-877, and *In re Application of Poppe*, No. A18-878." See brief for appellant at 1. In examining the language of a statute, its language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *AT&T Communications v. Nebraska Public Serv. Comm.*, 283 Neb. 204, 811 N.W.2d 666 (2012). While we agree with Windstream that the statutory language "'within a reasonable time'" is "forward-looking," reply brief for appellant at 2, it is nevertheless open to interpretation. On the face of § 86-136(1) alone, there is no plain and ordinary meaning to define the parameters of "within a reasonable time." And the phrase is not defined in any relevant definition section in the Nebraska Telecommunications Regulation Act. See § 86-103 (definitions found in §§ 86-103.01 to 86-121).

[6-9] A court may inquire into legislative history when a statute is open to construction because its terms require interpretation or may reasonably be considered ambiguous. See *Salem Grain Co. v. City of Falls City*, 302 Neb. 548, 924 N.W.2d 678 (2019). When construing a statute, an appellate

- 784 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

court must look to the statute's purpose and give to the statute a reasonable construction which best achieves that purpose, rather than a construction which would defeat it. *TracFone Wireless v. Nebraska Pub. Serv. Comm.*, 279 Neb. 426, 778 N.W.2d 452 (2010). An appellate court looks to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served. *Id*. And an appellate court construes statutes relating to the same subject matter together to maintain a sensible and consistent scheme, so that effect is given to every provision. *Id.*

Section 86-136(1) was originally located at Neb. Rev. Stat. § 75-613(1) (Cum. Supp. 1969). In 1969, the Legislature established a process under Neb. Rev. Stat. §§ 75-612 to 75-615 (Cum. Supp. 1969) for applicants who were not receiving and would not "within a reasonable time" receive reasonably adequate exchange telephone service from the company furnishing such service in the exchange service area in which the applicants resided or operated. See § 75-613(1). See, also, 1969 Neb. Laws, ch. 601, § 2, p. 2457. There is nothing enlightening in the corresponding legislative history about the Legislature's decision to use "within a reasonable time" as part of the standard for § 75-613(1). Even if there were, the facts at hand involve the question of how long is too long to wait to obtain broadband service, not merely telephone service—the subject technology in 1969.

The version of § 86-136(1) at issue here was established in 2012, pursuant to 2012 Neb. Laws, L.B. 715. Before that amendment, the PSC could order a boundary change based only on the "quality of the voice-grade [(landline telephone)] service the customer [was] receiving." See Introducer's Statement of Intent, L.B. 715, Transportation and Telecommunications Committee, 102d Leg., 2d Sess. (Feb. 13, 2012). The 2012 amendment updated boundary change provisions so that an application for a change is based on "broadband service." *Id.* See, also, L.B. 715, § 3 (advanced telecommunications capability service definition added); *id.*, §§ 4 to 7 (term

- 785 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

added elsewhere to reflect application was for broadband service). The phrase "within a reasonable time" in § 86-136(1) remained unchanged. L.B. 715, § 5. Clearly, the Legislature's amendments were meant to account for technological advancements, and it did not find it necessary (at least at that time) to amend the language at issue here. Compare L.B. 715, with 2019 Neb. Laws, L.B. 268, § 1 (replacing "within a reasonable time receive" in § 86-136(1) with "at the time of the application is not able to receive").

At a preliminary hearing on L.B. 715, counsel for the Transportation and Telecommunications Committee said:

> The state has experienced situations where a customer on one side of a boundary line receives high-speed broadband with one provider, while the provider on the other side of the boundary line does not offer broadband to another customer. Although these two customers live in close proximity to each other, the one with inadequate service is being held hostage by the outdated statute from receiving broadband from the one provider on the other side of the boundary line.

Transportation and Telecommunications Committee Hearing, L.B. 715, 102d Leg., 2d Sess. 2 (Feb. 13, 2012). Counsel asserted, "In a large geographic state with a sparse population, broadband has become a necessity to Nebraska." *Id.* During floor debate, the chairperson of the committee reiterated that exact statement. See Floor Debate, L.B. 715, 102d Leg., 2d Sess. 17 (Mar. 21, 2012). The chairperson also pointed out, "Broadband is the service customers want, and in many rural areas it is not available." *Id.*

While the legislative materials for L.B. 715 do not provide insight about the phrase "within a reasonable time" under § 86-136(1), the phrase remaining intact shows that, at least at that time, the Legislature preferred to leave the matter to the PSC's discretion to analyze on a case-by-case basis. See, also, *In re Application No. OP-0003*, 303 Neb. 872, 932 N.W.2d 653 (2019) (even under de novo standard of review,

- 786 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

it is appropriate to adhere to common practice among appellate courts to afford appropriate deference to findings of agency before which record was created). In its order in the present case, the PSC stated, "given the utility and necessity of access to broadband internet in today's world, even short delays may present significant inconveniences and challenges to Nebraska residents." The PSC related that the length of time it would consider to be reasonable within the context of §§ 86-135 to 86-138 was "relatively short" and "certainly shorter than the nearly eight months [Toben's] docket [had] been pending."

We agree with the PSC's determination that the timeframe at issue here did not meet the requirement of "within a reasonable time." Windstream was on notice of Toben's application in April 2018. In July, Toben asked for a continuance of the August hearing because Windstream represented that it expected to complete the project in Toben's area in September. Windstream failed to meet that deadline, and at the time of the hearing in November, the timeline was no more apparent due to unexpected zoning delays involving Adams County. Although Hedrick estimated the project would be completed by the end of the year, he acknowledged that was "not a guarantee." Windstream's zoning dispute was a relatively new delay; how fast it could be resolved (and whether resolution would impact the project) was vague. There was also evidence the Harvard project would take priority over the Doniphan-Hansen project, although it was not clear if or how that might delay the estimated goal to have service available to Toben at the end of 2018.

Windstream argues there was no evidence about the "quality of Hamilton's service or timeframe for its deployment." Brief for appellant at 7. However, the pertinent statutory language does not require such evidence. Section 86-136(1) relates to whether an applicant is receiving or will receive within a reasonable time broadband service "from the telecommunications company which furnishes telecommunications service

- 787 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

in the local exchange area in which the applicant resides"; it unambiguously refers solely to the applicant's current telecommunications company, the one whose territory covers the area where the applicant resides. See *AT&T Communications v. Nebraska Public Serv. Comm.*, 283 Neb. 204, 811 N.W.2d 666 (2012) (language of statute is to be given its plain and ordinary meaning). The record supports that the requirements of § 86-136(1) were met, although as noted previously, we do not address whether the "local exchange area in which the applicant resides" includes property upon which an applicant presently owns and on which the applicant does not presently reside, but has demonstrated an intent to reside on such property in the future. Also, we need not address whether the other two elements of § 86-136 were satisfied, because Windstream does not dispute the PSC's conclusions under § 86-136(2) or § 86-136(3).

Finally, Windstream argues that it was not necessary to modify Windstream's Hansen Exchange so that Hamilton could provide Toben service. Although Windstream did not specifically assign this as an error, it did generally assign error to the PSC's determination that Toben would not receive reasonable advanced telecommunications capability service within a reasonable time "absent a change of Windstream's Hansen Exchange boundary." The PSC disagrees there was any error on this basis, arguing, "Whether Hamilton could or could not provide service without a boundary change is irrelevant, as a change in exchange area boundaries is required by the statute when the PSC finds the evidence warrants granting the application." Brief for appellee at 11. Although we do not agree that the statute *requires* the PSC to make a boundary change, see § 86-136 ("the commission may grant the application . . . if the evidence establishes the following"), we agree with the PSC that whether Hamilton could have provided service to Toben without a boundary change is not relevant to the PSC's decision. Section 86-136 does not contain language that would preclude a boundary change simply because

- 788 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE APPLICATION NO. C-4981
Cite as 27 Neb. App. 773

an adjacent local exchange could provide service without a boundary change. While there are other factors for the PSC to consider besides whether service can be made available within a reasonable time, see § 86-136(2) (requires consideration of whether revision of exchange service area is economically sound) and § 86-136(3) (requires consideration of costs of construction and rates), as noted previously, Windstream has not challenged the PSC's order as to either of those statutory factors.

## CONCLUSION

Under our de novo review, we affirm the December 18, 2018, order of the PSC granting Toben's application to modify his exchange service area from Windstream's Hansen Exchange to Hamilton's Doniphan Exchange.

AFFIRMED.